**In the matter of TRI–STATE ARMORED SERVICES, INC., Debtor.**

**Great American Insurance Companies, Plaintiff,**

v.

**Thomas J. Subranni, Esquire, Trustee for the Estate of Tri–State Armored Services, Inc., Defendant.**

Bankruptcy No. 01–11917/JHW.
Adversary No. 01–1132.

United States Bankruptcy Court, D. New Jersey.

Oct. 3, 2005.

John N. Ellison, Esq., Claudine Q. Homolash, Esq., Anderson Kill & Olick, Philadelphia, PA, Thomas Subranni, Esq., Nona L. Ostrove, Esq., Subranni & Ostrove, Voorhees, NJ, for Thomas J. Subranni, Trustee for the Estate of Tri–State Armored Services, Inc.

Steven N. Dratch, Esq., Julian Wilsey, Esq., Franzblau Dratch, Livingston, NJ, for Great American Insurance Companies.

John G. Buchanan III, Esq., Covington & Burling, Washington, DC, for NCR Corporation.

Ronald L. Glick, Esq., Stevens & Lee, Cherry Hill, NJ, for Diebold, Inc.

Philip B. Seaton, Esq., Gregory A. Lomax, Esq., Kevin H. Buraks, Esq., Wolf, Block, Schorr & Solis–Cohen, Cherry Hill, NJ, Steven J. Mandelsberg, Esq., Hahn & Hessen LLP, New York, NY, for Ameri-

can Express Travel Related Services Company, Inc.

Barbara Lanza Farley, Esq., Haddonfield, NJ, for Palm Desert National Bank.

## OPINION

JUDITH H. WIZMUR, Chief Judge.

In this adversary proceeding, the plaintiff, Great American Insurance Companies ("Great American"), seeks a declaratory judgment determining that the bankruptcy estate of the Chapter 7 debtor, Tri–State Armored Services, Inc. ("Tri–State"), is not entitled to insurance coverage under the crime insurance policies issued by the plaintiff to Tri–State prior to the filing of the bankruptcy petition. Great American seeks rescission of the policies issued to Tri–State for the years 1999 and 2000 on the ground of equitable fraud.[1] In the alternative, Great American relies upon contract exclusions to seek a declaratory judgment that Tri–State is not entitled to coverage. Because I conclude that the 1999 and 2000 policies issued by Great American to Tri–State may be rescinded on this record, I need not reach the contract exclusion issues posed.

In his counterclaim, the Chapter 7 trustee charges Great American with exercising bad faith in the procedures Great American employed in investigating and ultimately denying the claims of the Tri–State bankruptcy estate. The trustee asserts three causes of action in this regard, including breach of the implied covenant of good faith and fair dealing, violation of the

New Jersey Consumer Fraud Act, N.J.S.A. § 56:8–1 *et seq.*, and breach of an alleged fiduciary duty owed by Great American to Tri–State. As explained below, I conclude that none of these causes may succeed in this case.[2] The trustee's quest for compensatory and punitive damages for fraudulent and/or negligent concealment or destruction of evidence must also fail on this record.

## I. Facts and Procedural History

Tri–State Armored Services, Inc., the debtor herein, was an armored car company in the business of servicing automated teller machines ("ATMs") owned primarily by banks and other financial institutions. Tri–State operated in various states, including New Jersey, Pennsylvania, Maryland, Virginia and Connecticut. The company contracted directly with Diebold, Incorporated ("Diebold") and NCR Corporation ("NCR"), who in turn contracted with financial institutions to service their ATMs. Although there was no direct contractual relationship between Tri–State and most bank customers, the banks would routinely supply funds for their ATMs directly to Tri–State.

On or about October 20, 1997, Great American issued a comprehensive crime insurance policy to Tri–State, wherein the insurer agreed, subject to the policy's terms and conditions, to reimburse Tri–State for losses sustained by the insured caused by the fraud or dishonesty of its employees. The policy was renewed by the insurer from year to year, including

---

1. In its complaint, Great American seeks rescission of the policies issued to Tri–State for the years 1997 through 2000. Because the Chapter 7 trustee now limits the claims of the bankruptcy estate to only those claims arising under the policies that Great American issued in 1999 and 2000, Great American's quest for rescission of the 1997 and 1998 policies may be dismissed without prejudice.

2. Having determined that Great American is entitled to rescission of the specific insurance policies at issue herein, the trustee's request in his counterclaim for a declaratory judgment that coverage exists (Count 1), and for damages based on breach of contract (Count 2), are also denied.

the year commencing October 20, 2000. Tri–State terminated its operations on or about March 1, 2001.

Several of the individuals employed by the debtor, including William Mottin, Daniel Feuker, Barry Chesla, Joseph Fernandez and Nicholas Basile, engaged in extensive theft of money and property belonging to Tri–State's customers. In 2001, each of these individuals pled guilty to various conspiracy, money laundering and tax evasion charges.

Tri–State filed a Chapter 7 bankruptcy petition on March 2, 2001. Thomas J. Subranni, Esquire, was appointed as the Chapter 7 trustee.

On June 4, 2001, Great American filed this adversary proceeding, seeking a declaratory judgment to rescind the insurance policy and to declare that Tri–State had no insurance coverage. The trustee counterclaimed, seeking a declaratory judgment against Great American establishing insurance coverage, and for other relief. The trustee was joined in his counterclaim by several Intervenor Defendants.[3] Following extensive pretrial proceedings, the matter was tried for seventeen (17) days in 2003 and 2004, and hundreds of documents were marked into evidence.

As is relevant here to develop the factual background, I will review the operations of the debtor's predecessor, Executive Cash Services, Inc. ("Executive Cash"), the operations of Tri–State, and the circumstances surrounding Tri–State's insurance coverage with Great American.

### A. Executive Cash Services, Inc.

The predecessor of Tri–State, Executive Cash, was an armored car company owned by Daniel Antolini. As with Tri–State, the primary business of Executive Cash was the servicing of ATMs. In early 1997, Executive Cash contracted with CoreStates Bank to service about 500 of its ATM machines, CoreStates became dissatisfied with the performance of Executive Cash, terminated the contract around June 1997, and made a claim against Executive Cash for losses. Lloyds of London, Executive Cash's insurer for such losses, apparently denied coverage for the claim.[4]

During the summer of 1997, Antolini announced that he would close Executive Cash, but offered to the employees of the company the opportunity to purchase its assets. Five employees, including William Mottin, Daniel Feuker, Barry Chesla and two others, determined to purchase the assets. Tri–State Armored Car Services was incorporated on or about September 15, 1997, and commenced operations on October 1, 1997. The settlement with Executive Cash took place on or about October 21, 1997.[5]

**3.** By my opinion dated March 13, 2002, I granted Great American's motion to dismiss the counterclaims of the intervenor defendants, with the exception of the equitable estoppel claims of Diebold, Inc., NCR Corporation and Palm Desert National Bank. Great American was granted summary judgment as to the remaining equitable estoppel claims by my opinion dated August 13, 2003.

**4.** The manner in which the CoreStates claim was resolved is not apparent on this record. There is no indication that Tri–State, successor to Executive Cash, was charged with any liability in connection with the claim. On February 19, 2004, Antolini was convicted of several counts of wire fraud in connection with money converted from Executive Cash accounts belonging in part to CoreStates.

**5.** Testimony was offered by William Maldonado, Jr., an employee first of Executive Cash and then of Tri–State, that during the time Executive Cash was operating, Antolini, Mottin and Feuker would remove cash from the cash vault, which contained only customer money. Mottin and others denied that money was taken from the Executive Cash vault be-

B. Tri–State Armored Car Services, Inc.

Tri–State took over all of the assets of Executive Cash, including the entire customer base. Certain designated liabilities, such as vehicle loans, were assumed. Although new operating accounts were opened in Tri–State's name in October 1997, Tri–State continued to use the wire transfer account formerly used by Executive Cash, into which customers would wire cash for ATM replenishment, until December 1997, when Tri–State opened a new wire transfer account. The wire transfer account was not reconciled prior to or after the settlement with Executive Cash. Although financial statements of Executive Cash were promised to be provided by Antolini, such statements were never produced. Tri–State did not assume the Executive Cash liability to CoreStates.

The new shareholders of Tri–State were Barry Chesla (26%), William A. Mottin (18%), Daniel C. Feuker (18%), Thomas J. Thorton, III(18%) and Kenneth D. Bacan (20%).[6] All of the shareholders of the corporation were also directors and officers of the corporation. Mottin was designated as president and treasurer, while Chesla was the chief executive officer and secretary.

From the inception of Tri–State in October 1997, Mottin was the manager, the operational head and the decision maker at Tri–State. Tri–State's administrative headquarters were located in Hammonton, New Jersey, where Mottin and Feuker were stationed. Feuker ran the armored car aspect of the operation, including the management of guards, drivers and trucks.

Although Chesla held the title of CEO, he was located in Ligonier, Pennsylvania and he did not participate in the overall day-to-day operations of the company. Prior to the formation of Tri–State, he had served as the Ligonier terminal manager for Executive Cash. He continued in that role for Tri–State until some time in 1998, when he resigned his position as a Tri–State officer, director and employee. Tri–State agreed to purchase Chesla's stock in the company.[7] Tri–State also agreed to make lease payments to Chesla as the landlord for the Ligonier facilities because he owned the real estate which Tri–State occupied. Following his resignation, Chesla maintained an office on the Tri–State premises in Ligonier, and remained Tri–State's landlord in Ligonier.

From the commencement of Tri–State's business in October 1997 through on or about March 1, 2001, when Tri–State closed its doors and terminated operations, Tri–State never made a profit, although it grew to service 3,000 ATM machines, employed up to 200 people, and increased its annual gross revenues from $2 million to $6 million. For the year ending December 31, 1998, the company showed a book loss of $819,713.00 on its compiled financial

fore the formation of Tri–State. In light of my ruling herein, I need not resolve that factual dispute.

6. The shares of Thorton and Bacan were later acquired by Chesla.

7. The record contains several versions of the agreement to purchase Chesla's stock. In notes written by an employee of Tri–State's accounting firm, Tracey Heun Brennan & Co., on October 27, 1998, it is reflected that Mottin rather than Tri–State purchased Chesla's Tri–State stock "and is now 44% owner of the business." Another version of the transaction was offered by Mottin, who testified that the agreement with Chesla contemplated that after Tri–State completed its lease payments to Chesla, Chesla's shares of stock in the company would revert back to Tri–State. The 1999 S Corporation income tax returns of the company reflect that Mottin owns 82% of the stock, while Feuker owns 18% of the stock.

statement. For 1999, the book loss increased to $1,585,000.00. From the commencement of operations, operating expenses exceeded income by approximately $70,000.00 per month. The company routinely commingled the funds of the various financial institutions which it serviced, both in its wire account and its cash vault. Funds belonging to one bank would routinely be used to service the ATMs of another bank.

According to the accounting report submitted on behalf of the Chapter 7 trustee, as of the termination date of March 1, 2001, Tri–State customer claims ($54.6 million dollars) exceeded the funds recovered by the trustee ($21.9 million dollars to date) by $32.7 million dollars. Of the $32.7 million dollars, approximately $12.4 million dollars of losses are identified as attributable to certain categories of losses, while over $19 million dollars of losses are unexplained.

The identifiable losses incurred by Tri–State and its customers during the three and a half years of its operations may be divided into several categories: (1) the conversion of customer funds for operating expenses and personal use first by William Mottin and Daniel Feuker, and then by Nicholas Basile and Joseph Fernandez; (2) miscellaneous incidents of theft and losses, and (3) misappropriations by Barry Chesla.

 1. Conversion of Tri–State Customer Funds for Operating Expenses and Personal Use.

As noted above, Tri–State began to suffer losses from the commencement of its operations. Within a month of its formation, the company began to make unauthorized "borrowings" from its wire account and cash vault to pay operating expenses, notwithstanding the fact that the money belonged exclusively to customers, and was required to be used only to replenish ATM machines.[8] While most customers wired money directly into the Tri–State wire account or had cash delivered directly to the Tri–State cash vault, several customers provided replenishment funds by check, which should have been deposited into the Tri–State wire account. Instead, the checks were deposited into Tri–State's operating accounts.

The diversion of funds from Tri–State's wire account and cash vault occurred at the direction of Mottin and Feuker. The monies were utilized primarily for Tri–State operating expenses, although Feuker acknowledges using at least $75,000 of Tri–State's customer funds for personal expenses. Some records were maintained of the monies withdrawn, with a designation of "due to vault" [9] or "change" [10] appearing in the records. Some monies were returned to the vault and to the wire account, respectively, over the course of Tri–State's operation. Mottin acknowledged that the customers from whom money was "borrowed" had no knowledge of such borrowings. He also acknowledged that at first, funds diverted from the wire transfer account and the cash vault to Tri–State's operating accounts were deposited in amounts of less than $10,000, to evade the requirement of completing a currency transaction report at Tri–State's bank.

---

**8.** On November 7, 1997, a $30,000 withdrawal of customer funds was made, followed by a $50,000 withdrawal on November 15, 1997.

**9.** Joanne Ricchi used the designation of "due to vault" in the general ledger accounting system.

**10.** Michael Ricchi and William Maldonado, Jr., both cash vault employees at Tri–State, testified that when cash was removed from the vault, it was noted on the vault report as "change."

According to Joanne Ricchi, the company's bookkeeper who maintained the "due to vault" numbers, the amount of customer funds "due to vault" never exceeded $3 million dollars.[11] According to the accounting reports submitted to the Chapter 7 trustee, approximately $8.4 million dollars of customer funds were transferred from the Tri–State cash vault and wire account and utilized for Tri–State operating expenses, including payroll, lease payments to Chesla, payments to Antolini on account of the purchase price of Executive Cash assets, and other operating expenses.[12] In addition, approximately $315,000, including the $75,000 to Feuker, was kept for personal use by Tri–State's employees. According to Mottin, who was in charge of all operations at least through August 2000, he always intended to pay back the "borrowings" from anticipated future profits. In his opinion, each borrowing was not a reportable loss, but rather "an interest-free loan."

Tri–State's accounting firm, Tracey Heun & Brennan, was aware that company employees were "borrowing" customer funds to make payroll. The accountants advised against the practice, and noted on one income tax return and one financial statement that there was an amount "due to vault". Subsequent statements did not contain that notation. Some time in the year 2000, at Mottin's direction, when direct negotiations ensued between Tri–State and First Union Bank to service First Union's ATM machines, a new accounting firm was hired to produce financial statements that would not reference any "due to vault" entry, and that would improve the presentation of Tri–State's financial posture to First Union.

Key employees of Tri–State confirmed at trial that customer funds were routinely used for operating expenses, and that cash shortages in the vault were also routine. Joanne Ricchi testified that customer funds from the vault, the transit account and the wire account were deposited into Tri–State's operating account "quite frequently". Michael Ricchi, the manager of the vault, testified that he confronted Mottin and Feuker "many times" to complain about the withdrawal of customer funds from the vault. When he resigned in September 2000, Ricchi believed that the vault was missing $20 to $25 million. According to Chesla, he was told by Mottin that Mottin was using as much as $260,000 of customer funds each month to meet Tri–State expenses, and that Mottin had been using customer funds to meet expenses "since day 1 when we bought the company." Fueker, who often removed cash himself from the vault, also confirmed Tri–State's routine access to customer funds for operational expenses, and the resulting shortfalls due to customers. Joseph Fernandez testified that after he became director of client services in June 2000, he was made aware of substantial shortfalls to Summit Bank. William Maldanado, Jr., who worked in the cash vault and replaced Michael Ricchi as manager in September 2000, testified that there were persistent cash shortages "for years on end," and that the shortages would customarily be paid by Tri–State "with the customer's money." Maldonado testified that during the 2000–2001 time frame, the amount due to Summit Bank fluctuated between $6 million and $30 million, and that he had shared this information with his supervisors.

---

**11.** As of December 31, 1998, the balance due to the vault was noted as $667,844. As of December 31, 1999, that balance had grown to $2,069,958.

**12.** The $8.4 million dollars incorporates an amount of $640,500 which was paid back by Tri–State to the Tri–State cash vault and/or wire account.

During the summer of 2000, Tri–State came under investigation by federal authorities. Agents from the Internal Revenue Service demanded production of Tri–State's records, which Mottin turned over. On or about August 31, 2000, Mottin stepped down as president of the company, although he remained an employee of the company, with no adjustment in salary.[13] He testified that after September 1, 2000, he spent most of his time servicing ATMs out of the company's Maryland terminal, although he remained the key decision maker at the company and played a significant role in negotiating with First Union during the Fall of 2002 to contract directly with them to service their ATM machines. In September 2000, other key employees, including Michael Ricchi, manager of the cash vault, and David DeFebbo, the company's director of security, resigned.

After Mottin stepped down as president, Nicholas Basile and Joseph Fernandez took over. Basile was hired by Tri–State during the summer of 1999 by Mottin. Basile is the godson of Mottin's wife. Basile was in his early 30s and had no experience with ATM operations prior to his employment with Tri–State. Initially, he performed human resources tasks. In September 2000, following Mottin's resignation, he became president of the company because he "drew the short straw" among the new management team. When he became president, Basile had limited knowledge about the company, and relied on Mottin, whom he consulted with on a daily basis, and Fernandez, regarding most company-related decisions. He testified about Mottin's continuing role in the company as follows:

Bill was always the president .... [H]e was the decision maker of the company ... [I]t was his company .... [T]he daily operations of who is coming and going early, who can take a day off, you know, as a person to speak to the customers ..., that was kind of my role. But as far as Mr. Mottin, ... it was his company, and I would always confer with him before really making any ... major decisions. I mean, I wouldn't make them on my own.

Joseph Fernandez started out with Executive Cash as a driver in 1995, served Tri–State in various capacities, and became general manager of the company after Basile replaced Mottin as president. Like Basile, Fernandez acknowledged that even after Mottin resigned as president as of September 1, 2000, Mottin continued in his role as "the boss". Neither Fernandez nor Basile were ever shareholders of the debtor.

Both Basile and Fernandez admit that they took at least one check from the Tri–State wire account, on or about February 21, 2001, which consisted entirely of customer funds. They each pled guilty to federal charges in connection with the conversion of customer funds.

In February 2001, Mottin, Basile and Fernandez realized that the shortfall in customer funds amounted to millions of dollars and that Tri–State would not be able to repay the missing funds. At that point, the decision was made to close the company.

During the last week of Tri–State's operations at the end of February 2001, the situation at Tri–State was described as chaotic. Various financial institutions stopped sending money or called back money previously wired in. First Union froze its account and retrieved all of its

---

**13.** Mottin testified that he continued to receive his regular paycheck after he stepped down as president.

cash. The cash from the other Tri–State terminals, including Connecticut, Ligonier, Pennsylvania, and Maryland, was retrieved and brought into the Hammonton terminal, where a count was conducted. Upon the cessation of operations, a Chapter 7 petition was filed on March 2, 2001.

### 2. Incidents of Theft and Loss.

David DeFebbo, director of security at Tri–State until he left around September 2000, testified that cash shortages over $100 were frequent at Tri–State. With approximately 3,000 ATM machines serviced each week, involving approximately $12 million per day, a daily reported shortage was common, and very difficult to trace. According to DeFebbo, shortages were attributable not only to employee theft, but also to a lack of controls in the cash room, machine failure, human error and accounting mistakes. The daily balance sheets of the financial institutions whose ATMs were serviced would be "forced balanced", meaning that Tri–State would report to its customers that the daily balance was accurate "even though the money wasn't there."

In his testimony, DeFebbo described frequent instances when ATM customer funds were missing from their ATM machines. When claims were made by a financial institution, Tri–State paid them by taking money from another customer and turning it over to the customer who was making the claim. In a memorandum from DeFebbo to Fernandez dated August 22, 2000, DeFebbo described "the larger losses" he investigated over the last year, without resolution, including the following:

1. March 1–5, 1999

 Five Sovereign Bank ATM Machines

 Loss of $60,000

2. October 8, 1999

 First Union ATM, Newark Airport

 Loss of $108,640

3. February 5, 2000

 Heartland Bank, Garden State Mall, Paramus, New Jersey

 Loss of $50,000

4. February 19, 2000

 First Union ATM, Limerick, PA

 Loss of $129,820

DeFebbo wrote in his memorandum that a particular Tri–State employee, Nieves, was suspected in connection with these losses. He also noted other smaller losses "that are extremely difficult to trace .... You can imagine how difficult it can be and how small dollars get away from us, however, the small dollars mount up too!" According to the accountant's report submitted to the Chapter 7 trustee, approximately $421,000 can be identified as missing ATM customer funds attributable to various incidents.

DeFebbo testified that in every case of reported loss, he investigated the circumstances and always notified law enforcement authorities. Most of the losses were not resolved with certainty. None of the losses were reported to Great American, either directly, or on the annual applications for renewal, or to Marshall & Sterling ("M & S"), the insurance agent who placed Tri–State's coverage with Great American.[14]

---

**14.** That no incident of loss was ever reported to Great American or to M & S is not disputed, but there is a divergence in testimony about why such losses were never reported. According to DeFebbo, Mottin directed DeFebbo not to report the losses because he feared a rise in annual premiums and a loss of coverage. In contrast, Mottin claimed that he asked DeFebbo to report incidents to Tri–State's insurance agent, Ron Bray, but DeFebbo insisted on resolving the incidents without reporting them to the agent, and Mottin acquiesced.

### 3. Misappropriations by Chesla.

As noted above, Barry Chesla was hired by Tri–State's predecessor, Executive Cash, as the manager of the Ligonier, Pennsylvania facility. While Tri–State was still operating, a federal investigation ensued against Chesla, which culminated in a raid by federal investigative agencies on Chesla at the Tri–State Ligonier terminal in May 2000. The raid was publicized in newspapers, particularly in western Pennsylvania. Bill Mottin, then president of Tri–State, informed Tri–State employees and the press that the investigation pertained only to tax evasion charges against Chesla, and had no impact on Tri–State's operations. At the time, Chesla was no longer an employee, officer or director of Tri–State, but remained on the Ligonier terminal premises as Tri–State's landlord.

On September 18, 2001, Chesla pled guilty to charges of money laundering, and tax evasion. He testified at trial, by videoconference from prison, that his wrongdoing involved a kickback scheme during his employment with National Westminster Bank, his employer before Executive Cash, and continued through June 2000. Chesla testified that he had no control of checking accounts or financial records at Executive Cash, and he denied ever taking money for his personal benefit from either Executive Cash or Tri–State. He recalls that he sold his shares of stock to Mottin in October 1998,[15] and was paid periodically thereafter by Tri–State in the form of rent for the buildings which he owned and Tri–State leased. According to Chesla, after October 1998, he was completely divorced from Tri–State, except in his capacity as landlord. The issue of the extent to which Chesla was guilty of converting Tri–State customer funds at the company's Ligonier facility, if any, need not be resolved here

to address the opportunity of Great American to rescind the 1999 and 2000 policies.

### C. Tri–State's Insurance Coverage.

To operate its business, Tri–State was required by its customers to secure comprehensive employee dishonesty, crime and disappearance insurance. On or about September 10, 1997, Mottin, on behalf of Tri–State, completed and forwarded to M & S, which had served as the insurance agent for Executive Cash, an armored car operator's proposal form for Lloyds of London. It appears that Lloyds, who had provided coverage to Executive Cash, declined to offer coverage to Tri–State.

Ron Bray, the armored car specialist at M & S, then submitted Tri–State's application for coverage to Great American, noting that Lloyds of London had declined to offer coverage because a loss was currently under investigation. Bray reported that the business operation would be sold to the company's employees. Sean Missal, the Great American underwriter who reviewed Tri–State's application, knew that Executive Cash's insurance coverage was nonrenewed by Lloyds of London. By his handwritten notes on the application, he noted that Tri–State was not a "new" company, but rather an existing entity with prior management experience that was "changing hands." Missal testified that he knew of the CoreStates' claim against Executive Cash, but that he understood that the claim was based on an accounting discrepancy.

On or about September 18, 1997, Mr. Missal hired AMSEC International, Inc. ("AMSEC") to perform a security survey of Tri–State's Hammonton, New Jersey facility, the company's headquarters and main operating facility. AMSEC is an outside security firm normally retained by

---

**15.** Chesla believed that he transferred 51% of the shares in Tri–State to Mottin.

Great American to assess security measures and risks. A security survey report was issued by AMSEC in late September, recommending numerous improvements in Tri–State's security systems and procedures. The report was forwarded to Missal with a note that Tri–State

> has a long way to go before it could be considered as meeting acceptable standards. The most significant problems are the inadequate vault and alarm systems.... [A] follow-up inspection would seem to be in order within 90–120 days to assess the assured's progress.

A Tri–State application for insurance coverage was submitted to Great American on October 7, 1997. William Mottin was noted as President, Barry Chesla was designated as Chief Executive Officer, and Dan Feuker was listed as Vice–President. Mottin signed the application. On October 10, 1997, Great American offered coverage to Tri–State, contingent upon the submission of a revised armored car application, a written agreement from Tri–State that it would comply with the recommendations listed in the AMSEC report within 60 days, and a written recitation from Tri–State of the five-year loss history of Executive Cash, including a description of any open claims.

Mottin responded to the offer with an indication that he believed that all of AMSEC's recommendations could be complied with. Ron Bray forwarded a revised application to Missal, indicating that M & S had been writing the account since 1990, and "there has been no paid claims to date with the previous owners." He described the CoreStates claim as a demand for reimbursement that was actively being investigated, with "rumors that a substantial amount of the money demanded has been accounted for." Bray also indicated that CoreStates has "backed off" the filing of a lawsuit.

A comprehensive employee dishonesty, crime and disappearance insurance policy was issued by Great American to Tri–State on October 20, 1997. On December 9, 1997, Tri–State requested additional vault coverage. Mottin testified that he believed a new account was picked up at that time. By then, at least $80,000 had been removed from the vault by Tri–State for use in its operating account. The increase in coverage was approved by Great American.

The Great American policy was renewed in October 1998 using a renewal insurance application that was nearly identical to the prior year's application form and questions. The 1998 insurance application was signed by William Mottin as president of Tri–State on October 13, 1998. Unlike the 1997 insurance application, Barry Chesla is not listed as Tri–State's CEO. In response to questions regarding "all claims or occurrences that may give rise to claims for the prior five years", Tri–State responded "N/A". Under "Please provide descriptions of all losses in excess of $5,000, including corrective action," there was no response. Great American conducted no follow-up to Tri–State's responses before issuing a renewal policy.

Prior to the October 1999 renewal process, at Mottin's request, Great American directed AMSEC to conduct a security survey of the Tri–State Ligonier branch terminal. Herbert R. Cunningham, the AMSEC employee who conducted the survey, wrote to Missal on September 14, 1999, that there were five areas of "significant concerns," including access control, alarm coverage, liability storage, liability staging and accountability. Under "General Impression," Cunningham noted the following:

> Small town operation with very laid back local management. Corporate President, Mr. Mottin, was visibly concerned

when informed that four managers possessed full access into the vault. Comparison of some records from the Hammonton, New Jersey (corporate) office, and the employee & policy manuals provided by corporate indicate that Ligonier management is not following established policy and procedure.

On November 19, 1999, after the 1999 renewal was issued, the AMSEC survey of the Ligonier branch was forwarded by Great American to the insurance broker, with instructions to review the report with the insured and implement the recommendations. According to the forwarding letter, Missal, on behalf of Great American, noted that some of the recommendations have already been implemented, while other recommendations must be implemented forthwith.

In the 1999 insurance application, Mottin is listed as president and CEO, while Feuker is listed as vice-president. In connection with the underwriting process for the 1999 policy, Sean Missal prepared a Risk Analysis and Summary Form, or "CURE sheet", which is an overview of the account for underwriting and pricing purposes.[16] The 1999 CURE form is the only one produced by Great American in connection with the renewal policies issued to Tri–State in 1998, 1999 and 2000. The only negative underwriting characteristic noted on the CURE form was the absence of random credit checks of employees. Tri–State's answers to the claims and losses questions on the renewal application remained the same in 1999.

On June 22, 2000, Mark Lowers, an AMSEC employee, faxed to Great American underwriters Missal and Scheckton, an article from the Pittsburgh Post–Gazette dated June 10, 2000, entitled "Federal Agents Probe Pilfering of ATM Cash", which reported that Barry Chesla, "a former principal investor in New Jersey-based Tri–State Armored Services Inc.," was raided by FBI agents in Ligonier Township. The article further reported that Chesla was under investigation by the FBI and the Internal Revenue Service for "pilfering millions of dollars meant for automatic teller machines" and "for allegedly stealing money from the company starting in 1996." According to the article, "Barry Chesla, Amy Chesla and others had access to millions of dollars of the currency owned by the customer banks ... and engaged in a scheme to defraud these federally insured institutions." Although no criminal indictments were filed as of that point, several federal civil forfeiture complaints were filed against the Cheslas, seeking the forfeiture of 10 properties allegedly purchased with nearly $2 million in converted funds. The article stated that "Tri–State itself is not under investigation," and that Chesla was no longer a shareholder in Tri–State.

In response to the article, Missal and Scheckton requested that Ron Bray at M & S inquire about the facts alleged in the article by contacting Tri–State. When Mottin was contacted by Bray, Mottin assured Bray that the investigation involved only Chesla, and did not involve Tri–State or any of Tri–State's customers. Bray communicated that message back to Missal and Scheckton, who heard nothing more about any losses at Tri–State prior to renewal. Great American did not investigate the matter further.

On the next renewal application in October 2000, submitted on behalf of Tri–State by Nicholas Basile as president, and not-

---

16. The "CURE" process (Corroborative Underwriting Review) at Great American requires the underwriter to consult with and obtain approval from another experienced underwriter before issuing a new policy or renewal.

ing Mottin as CEO, no claims or losses were reported. Great American again renewed the policy. Following the renewal of coverage, there was no further contact between Tri–State, M & S and Great American until on or about February 26, 2001. On that day, Nick Basile called Ron Bray at M & S to advise him that Tri–State was closing its doors, and that there may be a significant shortfall in customer cash. In turn, Bray reported the news to Great American, which immediately retained AMSEC to investigate the prospective loss. As noted above, the debtor filed a Chapter 7 petition on March 2, 2001. Great American filed an adversary proceeding on June 4, 2001, seeking a declaratory judgment that Tri–State's Comprehensive Employee Dishonesty, Crime and Disappearance Insurance policies should be rescinded and that the Tri–State bankruptcy estate was not otherwise entitled to insurance coverage on its claims.

## II. Discussion

In its amended complaint, Great American seeks to rescind each of the four comprehensive crime insurance policies it issued to Tri–State from October 1997 through October 2000. Great American alleges that Tri–State was created as a criminal conspiracy to defraud Tri–State customers and to defraud Great American, and that Tri–State misrepresented material information about losses in its renewal applications for 1998, 1999 and 2000, on which Great American actually and reasonably relied. Alternatively, Great American contends that the losses incurred by Tri–

State and/or its customers in connection with the dishonest and/or criminal acts of the company or its owners are excluded from coverage under the policies issued by Great American, and that Tri–State breached its responsibilities under the insurance policies by failing to provide proper and timely notification of its losses to Great American.

At trial, the trustee limited his claims against Great American to recovery under the policies issued in 1999 and 2000. The trustee initially withdrew his quest to recover losses sustained by Tri–State in connection with specific incidents of theft and loss, but renewed the quest to recover those losses following certain testimony.[17] The trustee continued to assert claims against Great American for bad faith in engaging in "post-loss underwriting" and for fraudulent and/or negligent concealment or destruction of evidence.

■ Because the trustee is not making any claims under the 1997 and 1998 policies, Great American's quest to rescind those policies is dismissed without prejudice. I am convinced on the record presented that Great American is entitled to rescind the policies issued to Tri–State in 1999 and 2000. Below, I will discuss the bases of my determination to rescind, as well as my reasons for dismissing the trustee's bad faith and spoliation claims against Great American. Because the claims in question here raise issues of state law, I will apply the laws of New Jersey to resolve this matter. *In re Finney*, 130 Fed.Appx. 527, 530 n. 3 (3d Cir. 2005); *Ungaro–Benages v. Dresdner Bank*

---

17. Barry Chesla testified that although he committed criminal acts in connection with his employment with NatWest, which acts continued through June 2000, he did not convert any monies from either Executive Cash or Tri–State. David DeFebbo, Tri–State's Director of Security, testified that none of the specific incidents of theft or loss described

above were resolved with certainty. The trustee takes the position that the funds that had been believed to have been converted by Chesla, and stolen by Tri–State employees, should now be recoverable under the Disappearance portion of the policy. Because I conclude that the 1999 and 2000 policies may be rescinded, this issue need not be resolved.

*AG,* 379 F.3d 1227, 1232 (11th Cir.2004) ("Under the Erie doctrine, a federal court adjudicating state law claims applies the substantive law of the state.") (citing *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)).

### A. Rescission.

▮▮▮ Rescission is the abrogation of a contract *ab initio,* "meaning that it is considered 'null from the beginning' and treated as if it does not exist for any purpose." *First American Title Ins. Co. v. Lawson,* 177 N.J. 125, 137, 827 A.2d 230, 237 (2003) (citation omitted); *Progressive Cas. Ins. Co. v. Hanna,* 316 N.J.Super. 63, 71 n. 10, 719 A.2d 683, 688 n. 10 (App.Div.1998). Under New Jersey law, an insurer may seek to rescind an insurance contract on equitable fraud grounds. Unlike legal fraud, actual intent to deceive need not be established to constitute equitable fraud. "Even an innocent misrepresentation can constitute equitable fraud justifying rescission." *Ledley v. William Penn Life Ins. Co.,* 138 N.J. 627, 635, 651 A.2d 92, 95 (1995).

▮▮▮ In order to rescind an insurance contract on grounds of equitable fraud, a party must demonstrate: " '(1) a material misrepresentation of a presently existing or past fact; (2) the maker's intent that the other party rely on it; and (3) detrimental reliance by the other party.' " *Lawson,* 177 N.J. at 136–37, 827 A.2d at 237 (quoting *Liebling v. Garden State Indem.,* 337 N.J.Super. 447, 453, 767 A.2d 515 (App.Div.), *certif. denied,* 169 N.J. 606, 782 A.2d 424 (2001)). In the context of an insurance contract, " 'a representation by the insured, whether contained in the policy itself or in the application for insurance, will support the forfeiture of the insured's rights under the policy if it is untruthful, material to the particular risk assumed by the insurer, and actually and reasonably relied upon by the insurer in the issuance of the policy.' " *Id.* at 137, 827 A.2d at 237 (quoting *Allstate Ins. Co. v. Meloni,* 98 N.J.Super. 154, 158–59, 236 A.2d 402, 405 (App.Div.1967)). The elements of rescission must be established by clear and convincing evidence. *See, e.g., Batka v. Liberty Mut. Fire Ins. Co.,* 704 F.2d 684, 688 (3d Cir.1983); *Caixa Geral de Depositos, S.A. v. Jacinto Rodrigues,* No. COV/A/03–746 MLC, 2005 WL 1541055, *9 (D.N.J. June 30,2005); *Farris v. County of Camden,* 61 F.Supp.2d 307, 336 (D.N.J.1999).

Great American contends that the renewal policies issued to Tri–State in 1999 and 2000 must be rescinded because Tri–State made untruthful representations on the renewal applications, which were material to the acceptance of the insurance risk by Great American, and on which Great American actually and reasonably relied in the issuance of the policies. Great American directs our attention particularly to the section of both applications entitled "Loss History". Under that caption, two separate questions are posed, as follows:

> "Enter all claims or occurrences that may give rise to claims for the prior five years." Check here if none (____)

Under this question, there are columns intended to detail the circumstances of the occurrence or claim, including the date of the occurrence, a description of the occurrence or claim, the date of the claim, and the claim status. The follow up question asks:

> "Please provide descriptions of all losses in excess of $5,000, including corrective action."

The answers provided by the debtor to these two loss history questions were the same in 1998, 1999 and 2000. The response to the first question was: "N/A". The response space to the second question was left blank.

Great American's contention that Tri–State materially misrepresented the loss history of the company in these applications relates to both the failure of the company to report individual occurrences of loss relating to employee theft, accounting discrepancies or unsolved occurrences of theft, and the broader category of losses occasioned by the conversion of customer funds by management for Tri–State's operational purposes.

Each of the elements of rescission: (1) that the information contained in the application for insurance is demonstrated to be untruthful, (2) that it is material to the particular risk assumed by the insurer, and (3) that it was actually and reasonably relied upon by the insurer in the issuance of the policy, is examined below. *See First American Title Ins. Co. v. Lawson,* 177 N.J. at 136–37, 827 A.2d at 237.

### 1. Untruthfulness.

 The first question on the Great American renewal application at issue, requiring the applicant to "[e]nter all claims or occurrences that may give rise to claims", is a "subjective" question "directed toward probing the knowledge of the applicant and determining the state of his mind." *Ledley,* 138 N.J. at 636, 651 A.2d at 96. In other words, the question seeks to probe the personal opinion or the subjective belief of the applicant as to whether past occurrences may give rise to future claims.

> Answers to subjective questions do not constitute equitable fraud if "the question is directed toward probing the knowledge of the applicant and determining the state of his mind and . . . the answer is a correct statement of the applicant's knowledge and belief . . . ."

With respect to subjective questions, "an insurer must demonstrate not only that an answer was false, but also that the insured knew that it was false."
*F.D.I.C. v. Moskowitz,* 946 F.Supp. 322, 329–30 (D.N.J.1996) (citations omitted).

The debtor answered the question regarding claims, or "occurrences that may give rise to claims" with the notation, "N/A", presumably meaning "Not applicable". The response was at least partly truthful, because no claims were ever filed by Tri–State with Great American prior to the cancellation of the policy in March 2001. However, it is undisputed that when both the 1999 and 2000 renewal applications were completed and sent to Great American,[18] Mottin was well aware of, and personally responsible for, the significant losses being incurred by Tri–State's customers because their funds were being used for operating expenses. Mottin also knew about specific incidents of employee theft during 1998, 1999 and 2000. In the recent *Lawson* decision, the New Jersey Supreme Court concluded that where an individual certifies on an insurance application that he does not know of "any circumstances or any allegations or contentions as to any incident, which may result in a claim being made," 177 N.J. at 139–40, 827 A.2d at 238–39, and the same individual is himself misappropriating client funds, " 'no reasonable factfinder could conclude anything other than that [the individual who completed the application] knew his [answers and statements] to be false.' " *Id.* at 140, 827 A.2d at 239 (citation omitted). Here, given the substantial and continuing conversion of customer funds by Mottin and Feuker from as early as November 1997, and the many specific unreported incidents of theft and loss throughout Tri–State's

---

**18.** The 1999 renewal application is stamped with Mottin's signature. Valerie Reynolds, Mottin's assistant who was charged with completing the application, testified that she was certain that Mottin authorized the stamping of his signature.

history, I believe that no reasonable fact-finder could conclude anything other than that Mottin knew that the "N/A" answer to the question requiring details about "occurrences that may give rise to claims" was false.

■■■■ Even if Mottin subjectively believed that the conversion of customer funds would not give rise to claims against the policy, because he intended that Tri–State would pay back all "borrowings" [19], the failure by Tri–State, through Mottin, to provide a response to the second "Loss History" question on the Great American renewal application, which called for a description of all losses over $5,000, was objectively untruthful. An objective question seeks " 'information within the applicant's knowledge.' " *Liebling v. Garden State Indemnity*, 337 N.J.Super. 447, 454, 767 A.2d 515, 518 (App.Div.2001) (quoting *Ledley*, 138 N.J. at 636, 651 A.2d at 96). Where an objective question is posed, " [e]ven an innocent misrepresentation can constitute equitable fraud justifying rescission.' " *Id.* at 453, 767 A.2d at 518 (quoting *Ledley*, 138 N.J. at 635, 651 A.2d at 95). The debtor's failure to provide a description of losses over $5,000 for each of the renewal periods constitutes "blatant and direct misrepresentations" for equitable fraud purposes, both as to individual occurrences of loss occasioned by employee theft, and as to losses occasioned by the conversion of customer funds by management for operational purposes. *See Lawson*, 177 N.J. at 140, 827 A.2d at 239.

Tri–State contends that the failure of Mottin to address losses on the renewal application may be attributable to the ambiguity of the question, suggesting that the term "losses" on the renewal application could have been interpreted to exclude unreported incidents of theft or loss, and to include only those losses which were actually reported to the insurer. Because Tri–State did not report any losses to Great American, its failure to list any losses on the renewal applications would not constitute untruthfulness in the context of equitable rescission.

■■■ Tri–State is correct to assert that where an application question is ambiguous, the ambiguity will be construed against the insurer and in favor of the truthfulness of the representation. The New Jersey Supreme Court has held that "[w]ith insurance policies, ambiguous contractual language is construed in favor of the insured and against the insurer. Because insurance policies are often contracts of adhesion, we assume 'a particularly vigilant role in ensuring their conformity to public policy and principles of fairness.' " *Cruz–Mendez v. ISU/Insurance Services of San Francisco*, 156 N.J. 556, 571, 722 A.2d 515, 522–23 (1999) (citations omitted). *See also Fidelity & Deposit Co. of Maryland v. Hudson United Bank*, 653 F.2d 766, 772 n. 8 (3d Cir.1981); *Doto v. Russo*, 140 N.J. 544, 556, 659 A.2d 1371, 1376 (1995).

In the *Hudson United Bank* case, the bank's failure to disclose a potential claim against the previous carrier did not constitute equitable fraud to support the rescission of the policy. The bank filled out an application for a fidelity bond which contained a chart entitled "Six-year loss infor-

---

**19.** The fact that Mottin pled guilty to the criminal offenses of money laundering and conspiracy to commit money laundering, 18 U.S.C. § 1956(a)(1)(A)(i) and § 1956(h), is inconsistent with the proposition that Mottin believed that Tri–State would eventually repay the temporary "loans" from customer funds, and that he did not believe that claims would be made by Tri–State against Great American based on past occurrences. He acknowledged by his guilty plea that he intentionally engaged in illegal activity when he converted customer funds for Tri–State operational purposes.

mation." The chart required information about each loss, including the "Amount Recovered From Insurance." The parties did not dispute that the losses reflected in the chart were only those losses that would be covered under the fidelity bond. The parties disagreed as to whether the chart required a history of covered losses that had actually been reported to the Bank's insurance carriers over the past six years. Accepting the insured's interpretation, that only reported claims were required to be listed, the court determined that the bank's response that "no losses [were] paid by insurance carrier during the past six years" was objectively truthful. 653 F.2d at 772–73. In the alternative, the court noted that if the chart was construed to require information pertaining to covered losses not yet filed with an insurance carrier, that would be a subjective inquiry which would not support rescission on the ground of equitable fraud where the application responses were not knowingly false.

Here, there is no basis to conclude that the "Loss History" portion of the Great American renewal application was ambiguous, or that it should be construed in favor of the insured to require a listing of only claims reported to the carrier. Unlike the application in *Hudson United Bank*, there was no reference in the Great American application to an "Amount Recovered from Insurance" as to each loss, which buttressed the insured's position in the *Hudson United Bank* case that only reported claims were required to be listed. More significantly, the Great American application at issue here requested information about both "all claims or occurrences which might give rise to claims", and "all losses in excess of $5,000". The two portions of the "Loss History" section of the application were separate, and each portion required thorough and truthful responses. Any "losses" incurred by the applicant were clearly distinguished from

any "claims" of the insured, including both reported claims and unreported claims, characterized as "occurrences that may give rise to claims."

More apposite here than the *Hudson United Bank* case is the decision in *In re Payroll Express Corp.*, 216 B.R. 344, 358–59 (S.D.N.Y.1997), aff'd, 186 F.3d 196 (2d Cir.1999), cert. denied, 529 U.S. 1019, 120 S.Ct. 1419, 146 L.Ed.2d 312 (2000). In *Payroll Express*, on the insurance application for "Employee Theft, Premises Loss and Transit Loss", the insurer asked the following question: "Has [the debtor] suffered a loss during the past five years? If 'yes', give brief details and amount involved." 216 B.R. at 352. In response to the question, the debtor disclosed only one loss of $1.5 million dollars, when in fact the debtor sustained 17 other theft and robbery losses totaling over $3 million dollars during the five years prior to the date of the insurance application. The debtor argued in part that the question was ambiguous, and that it reasonably interpreted the question to require information only pertaining to prior covered losses. The Southern District of New York responded as follows:

> As the Third Circuit has recently explained, under basic principles of New Jersey law the question of whether an insurance contract is ambiguous is a question of law. *See Pittston Co. Ultramar America Ltd. v. Allianz Ins. Co. et al.*, 124 F.3d 508, 520 (3d Cir.1997). In determining whether a contract is ambiguous, courts may not "torture the language of a contract to create ambiguity where none exists." *Id.* (quoting *Pennbarr Corp. v. Ins. Co. of North America*, 976 F.2d 145, 151 (3d Cir.1992) and citing *Longobardi v. Chubb Ins. Co. of New Jersey*, 121 N.J. 530, 582 A.2d 1257 (1990)). Rather, "[w]hen the terms of an insurance contract are clear ... it

is the function of a court to enforce it as written and not make a better contract for either of the parties." *Id.* (quotations from *State v. Signo Trading Int'l. Inc.,* 130 N.J. 51, 612 A.2d 932 (1992) removed). Thus, "[i]n establishing ambiguity, the insured must do more than suggest a possible alternative reading of the contract; it must also offer an objectively reasonable reading of the disputed passage". *Id.* (quotation omitted).

216 B.R. at 358. The court concluded that there was no ambiguity to the question, and that the debtor was obliged to report all losses suffered in the prior five years.

The phrase "a loss" cannot be transmuted into "a *covered* loss" by advocacy alone; to do so would fundamentally alter the only plain meaning of question 10 and inappropriately re-write the [insurer's] application. PEC [the insured] was obliged to disclose its losses whether they were covered or not, and [the insured's principal] Robert Felzenberg's material misrepresentations regarding the undisclosed losses serve as a basis to rescind each of the LEU Policies [the insurer].

*Id.* at 359.

Similarly, in this case, "descriptions of all losses in excess of $5,000" was required. Tri–State, by Mottin and then Basile, was required to disclose its losses, whether the losses were filed as claims or not, and whether they were "covered" losses or not. Mottin knew that customer funds were being withdrawn from the wire transfer account and the cash vault, that customer funds were being used for operating expenses, and that customers suffered substantial "losses" as a result of that activity.

Mottin also knew that specific losses in excess of $5,000 had been incurred on multiple occasions by Tri–State. No disclosure of these losses was provided.

■ As to the 2000 renewal application, Tri–State may not escape the consequences of the untruthfulness of the omissions in the application by Basile's asserted ignorance of its content. Basile testified that when he signed the renewal application, as Tri–State's president, he had no role in providing answers to the questions in the application, and would not have known the answers. He consulted with Mottin, who was still the "boss", and who continued to make decisions for Tri–State and to give direction to Basile. Mottin advised Basile to follow the same procedures for completing the 2000 renewal application as had been employed for the 1998 and 1999 applications. The administrative assistants in Mottin's office, first Jo Ann Ricchi and then Valerie Reynolds, would gather the information required, such as the number of employees, the number of ATM's serviced, and the security procedures employed, would complete the application, and would then present the completed application to Mottin for his signature. Basile followed the same procedure.[20] He testified that when he was presented with the completed application, he did not review it thoroughly, and he signed the document not knowing whether the information provided in the application was correct.

Basile's asserted ignorance of the 2000 renewal application contents cannot serve to defeat a finding that the application was untruthful with regard to the "Loss History" omissions for four reasons. First, as

---

**20.** Valerie Reynolds, the assistant for Mottin and then Basile, testified that by the time she completed the application for the year 2000, she believes that she probably had information about losses or occurrences that could give rise to claims. Nevertheless, she noted "N/A" on the application because she "was told to fill it out like the one from the year before." She did not remember who gave her that instruction.

noted above, Tri–State's answer to the quest by the insurer for a description of all losses over $5,000 was objectively untruthful, constituting equitable fraud justifying rescission even if the answer was an innocent misrepresentation. *Liebling,* 337 N.J.Super. at 453, 767 A.2d at 518.

Second, notwithstanding Basile's denial of knowledge, as of October 18, 2000, that Tri–State customer funds were being misused by the company, the record supports the conclusion that by the time he signed the renewal application, he was well aware that the company was sustaining substantial losses, and was using customer funds to pay for operating expenses. At trial, Basile acknowledged only that by October 18, as Tri–State's president, he had "heard rumors that there might be a problem regarding Tri–State's use of customer funds." However, during his guilty plea in United States District Court on January 7, 2002, Basile answered "Yes" to the question of whether he knew as of September 2000 "that Mr. Mottin was being investigated by federal authorities for monetary crimes including Tri–State." He recalled at trial that at a staff meeting in September 2000, Michael Ricchi announced "that he believed customer funds or customer monies were being used, and that's why there was a deficit." At his deposition, Basile testified that "after September 2000, upon learning of investigations and speculation by other employees ... I guess I addressed it with [Mottin] ... After that ... it was almost common knowledge ... that money was used." As well, Barry Chesla testified that sometime after the Ligonier raid in June 2000, Chesla met with Mottin, Basile and others, and was informed by Mottin that Tri–State customer funds were routinely used to meet operating expenses, at the rate of about $260,000 a month, and that this activity had commenced when the company was formed. This testimony supports the fact that when Basile signed the 2000 renewal application, he knew that customer moneys were being converted by Tri–State to meet operational shortfalls, and that substantial losses had been sustained.

Third, the Tri–State corporation must be charged with institutional knowledge of the significant losses suffered by the company by reason of specific unreported incidents of theft, and the long-standing and widely known practice of converting customer cash for use by Tri–State for operating expenses. There is no question that Mottin, who remained as the key decision-maker in the company, knew about these losses. In effect, Mottin delegated the task of completing the application to Basile and his assistant, Valerie Reynolds, who copied much of the information from the prior year's application. As well, most if not all of the Tri–State employees who testified at trial were well aware of the losses and shortfalls being experienced by the company. It has been held "that the corporation is affected with constructive knowledge, regardless of its actual knowledge, of all material facts of which its officer or agent receives notice or acquires knowledge while acting in the course of his employment and within the scope of his authority, and the corporation is charged with such knowledge even though the officer or agent does not in fact communicate his knowledge to the corporation." *Hollingsworth v. Lederer,* 125 N.J.Eq. 193, 206, 4 A.2d 291, 297 (Ch.Div. 1936), *aff'd,* 125 N.J.Eq. 193, 4 A.2d 300 (E & A 1939). *See also In re Integrity Ins. Co.,* 240 N.J.Super. 480, 505–06, 573 A.2d 928, 941 (App.Div.1990); *City of Paterson v. Fargo Realty Inc.,* 174 N.J.Super. 178, 193, 415 A.2d 1210, 1217 (Dist.Ct.1980) ("corporate entity cannot itself have knowledge; it could only acquire such knowledge through its agents, officers, or owners"); 9A WILLIAM MEADE FLETCHER,

FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 4589 at 265 (Rev.Vol. 2004) ("As a general rule, if the president, vice president, or director of a corporation has knowledge of a fact, that knowledge is imputed to the corporation."). "If any officer or agent acting within the general scope of his powers acquires knowledge of a particular fact while committing a fraud upon a third person in a matter pertaining to the business of the corporation, although the fraud is perpetrated for his own benefit, the corporation will be imputable with such knowledge, as well as with knowledge of the fraud, especially where it ratifies the transaction." *Hollingsworth, Id.,* 4 A.2d at 297–98 (citations omitted). Basile's protestations regarding lack of knowledge notwithstanding, Tri–State, and the trustee as successor-in-interest to the corporation, standing in Tri–State's shoes,[21] are bound by the institutional knowledge of the corporation at the time the 2000 renewal application was completed that the corporate representations under the "Loss History" portion of the application were not truthful.

▮▮▮ Fourth, in October 2000, Basile was authorized as president of Tri–State to sign the application. As the authorized representative of the corporation, Basile bound the corporation to the misrepresentations in the application.

> A corporation, possessing an identity only in a legal sense, necessarily speaks through its agents. In an action for contract rescission, an agent's misrepresentations bind the principal if the agent was authorized to represent the principal in obtaining the contract. *Equitable*

*Life Assurance Soc'y v. New Horizons, Inc.,* 28 N.J. 307, 146 A.2d 466, 470 (1958); *see also Parker Precision Prods. Co. v. Metropolitan Life Ins. Co.,* 407 F.2d 1070, 1073 (3d Cir.1969) (applying New Jersey law to find the corporate principal responsible for the material misrepresentations of the corporation's president on an application for life insurance).

*In re Payroll Express Corp.,* 186 F.3d 196, 207 (2d Cir.1999). As one commentator explains:

> If the court is satisfied that the officer or employee making the innocent, or negligent or willful misrepresentations on behalf of the insured had the actual, implied, or apparent authority to do so, the misrepresentations will be imputed to the insured.

Joseph K. Powers, *Pulling the Plug on Fidelity, Crime and All Risk Coverage: The Availability of Rescission as a Remedy or Defense,* 32 TORT & INSUR. L.J. 905, 927–28 (1997).

On this record, I conclude that Tri–State's omissions on the "Loss History" section of the 1999 and 2000 renewal applications constitute untruthfulness for the purpose of applying the equitable fraud principles herein.

### 2. Materiality.

▮▮▮ Under New Jersey law, to award the equitable relief of rescission on the basis of a misrepresentation in the application for insurance, the court must also determine that the misrepresentation is material. *F.D.I.C. v. Moskowitz,* 946

---

21. *See, e.g., Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., Inc.,* 267 F.3d 340, 356 (3d Cir.2001) (citations omitted) ("[I]n actions brought by the trustee as successor to the debtor's interest under section 541, the 'trustee stands in the shoes of the debtor and can only assert those causes of action possessed by the debtor. [Conversely,] [t]he trustee is, of course, subject to the same defenses as could have been asserted by the defendant had the action been instituted by the debtor.' "); *Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 885 F.2d 1149, 1154 (3d Cir.1989).

F.Supp. 322, 331 (D.N.J.1996). *Cf.* N.J.S.A. 17B:24–3(d) ("The falsity of any statement in the application for any policy or contract covered by this section may not bar the right to recovery thereunder unless such false statement materially affected either the acceptance of the risk or the hazard assumed by the insurer."). The New Jersey Supreme Court has held that "[a] misrepresentation is material if it 'naturally and reasonably influence(s) the judgment of the underwriter in making the contract at all, or in estimating the degree or character of the risk, or in fixing the rate of premium.'" *Ledley,* 138 N.J. at 638, 651 A.2d at 97 (citing *Manzo,* 122 N.J. at 115, 584 A.2d 190). Applying New Jersey law, the District Court for the Southern District of New York reflected that "'[c]ommon sense tells us that an applicant's prior loss history is material to a reasonable insurance company's decision whether to insure that applicant or determination of the premium.'" *Payroll Express,* 216 B.R. at 357 (quoting *Pinette v. Assurance Co. of America,* 52 F.3d 407, 411 (2d Cir.1995)).

Frank Scheckton, Senior Vice President of Great American's Crime Department, who personally supervised the underwriting of Tri–State's policies from 1997 through the 2000 renewal, testified that the information in an application is critical to the underwriting process, because

> If you are underwriting an account, you want details about internal controls, information about what the exposures are, you want to know about their hiring practices and you want to know about losses.

Scheckton emphasized that as an underwriter, he is "particularly interested in loss history", and requires an insured to report all losses to Great American, because the insurer regards the frequency of losses as indicative of operational shortfalls. Annual applications are required to inform the insurer about current operations, losses, and internal controls. The reporting of losses by an insured to its carrier is critical to the carrier, even if the amount of loss falls entirely within the deductible amount, because the frequency and severity of losses may reflect upon the adequacy of the deductible, and because the carrier's recovery and subrogation rights may be compromised by an insured's failure to report a loss.

To defeat the materiality of the Loss History information on the renewal applications, the debtor's insurance expert, Jo Ann M. Ralph[22], first contended that there was no obligation on the part of the insured to inform its insurer that it was using customer funds for its operating expenses, but ultimately agreed with the proposition that "full disclosure of loss information to the underwriter is mandatory", because "past experience is often a good indication of future risk."

There is no question that Scheckton's testimony confirms the materiality of the failure by Tri–State to reflect potential claims and losses in the 1999 and 2000 renewal application to the manner in which the risks associated with the policies were assessed, and to the decision by Great American to bind the policies. An applicant's prior loss history "is necessarily relevant to the insurer's calculation of risk." *Id.* (citing to OSTRAGER & NEWMAN, § 3.02 at

---

**22.** Jo Ann M. Ralph, CPCU, CIC, is the Managing Consultant/Partner of RK Risk Management, LLC, an insurance and risk management consulting service. Since 1974, she has held positions as an underwriter, producer, trainer and risk management/insurance consultant, and is knowledgeable about underwriting standards and practices, and claims handling standards and practices.

84) (quotation omitted). "Simple logic" dictates that information regarding over $400,000 of individual occurrences of theft, and regarding millions of dollars of customer funds converted for use by Tri–State, would be "material" to Great American in considering the issuance of insurance coverage to Tri–State. *See F.D.I.C. v. Moskowitz,* 946 F.Supp. at 332.

### 3. Actual and Reasonable Reliance.

 The third element necessarily demonstrated to establish entitlement to rescission is that the insured's material misrepresentation was "actually and reasonably relied upon by the insurer in the issuance of the policy." *Lawson,* 177 N.J. at 137, 827 A.2d at 237. There is no question that Great American actually relied upon Tri–State's representations in its renewal applications. The issue is whether such reliance was reasonable in light of the totality of the circumstances presented.

Missal and Scheckton confirmed that on the 1999 and 2000 renewals, Great American relied on the information in Tri–State's applications, including the "Loss History" section, which indicated that the account was "clean" since its inception, meaning that there were no claims or potential claims listed. According to Scheckton, "You can only rely on what your customer tells you". In the same vein, Missal testified that "what we do rely upon is what our insured tells us," noting further: "[T]hat's the main thing we have to rely on as an underwriter when you are doing business with somebody and they tell you information, you assume that that information is true and correct. You don't assume that they are lying to you." When policies are reviewed from year to year, if no claims have been made and the clients "are doing what they are supposed to do on their surveys", that is enough for the insurer to renew the policy. Missal and Scheckton believed that Tri–State was complying with most survey recommendations.[23] According to Scheckton,

> if [the insureds] tell you they don't have any claims, you have to think they are doing pretty good in terms of operations. I will tell you there is a distinction there. The policy says you are supposed to report anything to us, but it is really understood, ... if at the end of the day, you are short $10 you are not going to call the insurance company and say I am short $10 ... but normally, anyone who has a problem and it is over a $1,000 or $2,000, they call you.... When we see a lot of losses, it is indicative that something is wrong."

Scheckton testified that he has an expectation in the armored car industry that a loss will be reported immediately, and if no losses are reported, it indicates that the company is operating well. Scheckton testified further that if he had known that Tri–State consistently and regularly took customer funds to use for operating expenses, "[w]e would get off the policy."

 Great American was entitled to rely on the representations of its insured, and to believe that the information provided by its insured in annual renewal applications was truthful. In New Jersey, " '[c]ontracts of insurance are contracts of utmost good faith,' and 'the applicant therefor is bound to deal fairly with the insurer in the disclosure of facts material to the risk.' " *First American Title Ins. Co. v. Lawson,* 351 N.J.Super. 407, 421,

---

**23.** At the exit interview of the 1999 AMSEC survey of the Ligonier facilities,
Mr. Mottin "was commended for his proactive attitude and the cooperation of his staff" and agreed to implement some recommendations and to seriously consider others for implementation.

798 A.2d 661, 669 (App.Div.2002) (citations omitted). *See also* LEE R. RUSS, COUCH ON INSURANCE, § 81:21 (3d Ed.2005) ("The concept of concealment includes a duty to disclose, and since contracts of insurance are deemed to be contracts of the utmost good faith, the applicant for insurance is bound to deal fairly with the insurer in the disclosure of facts material to the risk."). The insured has an "obligation when asked a specific question in the insurance application, to respond truthfully." *Progressive Cas. Ins. Co. v. Hanna,* 316 N.J.Super. 63, 70, 719 A.2d 683, 687 (App.Div.1998). *See also Sears Mortg. Corp. v. Rose,* 134 N.J. 326, 347, 634 A.2d 74, 84 (1993) ("The prospective insured must not misrepresent or conceal information concerning risks entailed in coverage under an insurance policy."); 12A JOHN ALAN APPLEMAN & JEAN APPLEMAN, INSURANCE LAW AND PRACTICE WITH FORMS, § 7271 at 302–03 (Rev.Vol. 2005) ("Fair dealing requires the insured to state everything which might, and probably would, influence the insurer in entering into or declining the risk, and in disclosing all information material to the risk about which information is sought.").

The trustee attempts to defeat the reasonableness of Great American's reliance on several related grounds. The trustee highlights the deficient underwriting practices at Great American generally, as well as the substandard and inadequate procedures employed by Great American to underwrite the 1999 and 2000 Tri–State re-

newals. The trustee also contends that there were sufficient indications to Great American, or "red flags", at the time of the 1999 and 2000 renewal applications to place Great American, as a prudent insurer, on notice to commence an inquiry, which would have revealed Tri–State's omissions and misrepresentations.[24] Finally, in conjunction with the above mentioned red flags and other underwriting deficiencies, the trustee contends that the "post-loss underwriting" performed by Great American following the receipt of notice that Tri–State had suffered substantial losses should cause the court to conclude that Great American could not have reasonably relied on the renewal application omissions to issue the two policies.

a. Underwriting and Red Flags.

Ms. Ralph testified that generally, underwriting procedures include reviewing applications, verifying information based on other sources or independent requests for information, evaluating surveys, reviewing coverages being requested in comparison to the risk characteristics of the exposure, and determining pricing. Independent sources would include credit checks, reviewing internal and external loss control measures, and Dun & Bradstreet review. The renewal each year is a separate decision requiring proper underwriting procedures to be employed each year, although the insurer also builds on its experience with its insured each year.

---

**24.** The Intervenor Defendants (American Express Travel Related Services Company, Inc., Diebold, Inc., and NCR Corporation) interpret my opinion on Great American's summary judgment motion to mean that if various enumerated "red flags" were proven at trial, that the red flags would confirm that Great American was on inquiry notice of the unreported losses, and that its failure to conduct a sufficient inquiry precludes its reliance on omissions in the renewal applications for equitable fraud purposes.

The Intervenor Defendants mistake the import of my opinion denying summary judgment. The issue here is not whether the so-called red flags have been proven. Rather, the issue is whether an industry standard has been established on this record that if such indicators as are present here are made known to the insurer, that the insurer is obligated to either conduct a reasonably diligent investigation, or to forego reliance on the representations of the insured for rescission purposes.

According to Ms. Ralph, in the mid–90's through the fall of 2001, the marketplace for commercial insurance of the type at issue in this case was soft, meaning that the market was highly competitive, insurers were aggressive in writing business, underwriting practices became more relaxed, and the scope of underwriting analysis was less rigorous.

Ms. Ralph identified many deficiencies in the underwriting practices and controls at Great American during the time that Tri–State was a Great American insured. There were no written underwriting manuals or procedures. Formal underwriting training, including outside course work, was lacking.[25] There was no formal continuing education for underwriters. The primary training process at Great American was "sitting with others", which, according to Ralph, was not in conformance with industry standards. Follow-up on risk assessment surveys, either formally or informally, was not generally done. Although financial statements were required to be submitted with renewal applications, the failure by an insured to submit a financial statement was ignored. The underwriting files, particularly Tri–State's files, were incomplete and were missing important information about risk assessment and pricing that would not permit a new underwriter or supervisor to trace the analytical steps taken by the original underwriter to afford coverage.

Ms. Ralph highlighted the failure of the underwriters to require and review financial statements. She contends that the 1998 compiled financial statement for Tri–State which was appended to its 1999 renewal application, showing a retained deficit that had grown during the reporting period from about $250,000 to over $1 million, and a "due to vault" designation, should have been questioned. Ralph noted that an important resource for underwriting, Felton and Sears, *Fidelity Bonds,* recommends, in the context of underwriting for financial institutions, that the capitalization and profitability of the company should be reviewed. The analogy to armored car companies is that if a company is not adequately funded, there may not be adequate controls and there may be greater vulnerability to theft.[26]

As to the underwriting of the Tri–State 1999 and 2000 renewal applications, Ralph reflected upon the specific deficiencies in the Tri–State underwriting file, noting that lists of customers and loss payees were missing, CURE sheets for 1997 and 1998 were missing, there was no information from outside sources, and there were minimal references to the manner of calculation for the pricing of the premiums.

For the 1999 renewal, Ms. Ralph criticized the lack of response or follow-up to the AMSEC September 1999 survey of the Ligonier location. According to Ms. Ralph, renewal should have been condi-

---

**25.** Sean Missal became employed at Great American as an underwriting trainee in 1995, when he graduated from college. After a month of actual policy study, he had on-the-job training for one year. He was first exposed to underwriting for armored car polices in late 1996 or early 1997. As part of his training, he visited the AMSEC facility, where he learned about physical security and operational procedures.

**26.** The Great American underwriters testified that they only review the financials of publicly owned armored car companies. They assume that the unaudited financial statements of small, privately held companies are not a credible source of information about the company's operations, because the principals of such companies "play with their numbers too much", because Great American is not insuring the assets of the company, and because there is no independent audit to verify accuracy. Missal testified that although he requests audited financials, most of the time he does not receive them.

tioned on compliance with the survey recommendations, as well as followed up by Great American. Although the 1999 CURE sheet reflects that the insured "needs to work on recommendations from survey,"[27] Ms. Ralph opined that the noted reaction to the survey was "certainly not of the significance you would expect." There was no indication in the underwriting file that the survey recommendations were reviewed after renewal, except that the survey results were forwarded to Tri-State's broker after the renewal, in November 1999.

Other criticisms raised by Ms. Ralph to the underwriting of the 1999 Tri-State application included the failure of the underwriters to raise questions about the changes in the initial management team, such as the reason for the change and any impact of the change on the company, and whether the changes might increase the risk. As well, Ms. Ralph noted that on all three applications from 1997 to 1999, Tri-State acknowledged that it did not routinely conduct random credit checks of employees. Underwriting concern should have been generated because employees with money problems are "a precursor to claims arising from fidelity," and may represent increased risk of theft. The fact that the application reflected that the Tri-State director of security had complete combination and alarm codes should also have generated concern and response from the Great American underwriters.

According to Ms. Ralph, underwriting for the 2000 renewal of Tri-State's coverage was even more flawed. For that year, the CURE process for Tri-State's application occurred at a convention in Las Vegas, between Missal and Scheckton, on the convention floor. No new CURE sheet was formulated for the 2000 renewal.

Rather, the 1999 CURE sheet was used. Scheckton recalled that "we simply signed on the bottom that he [Missal] discussed and reviewed with me for the next year because the renewal was coming in late and there was competition on the deal and he talked to me about it on the convention floor." Scheckton also recalls noting "that there were no losses".

Like the underwriting for the 1999 application, the underwriting for the 2000 application was criticized by Ms. Ralph for the failure to scrutinize incomplete answers to the Loss History section, management changes, including the introduction of Basile as president, and other personnel changes. As well, it does not appear that the underwriters responded in any way to the fact that random credit checks of employees had still not been instituted, or that the director of security still had possession of complete combination and down codes.

According to the trustee, both prior to and at the time of the 2000 renewal, a series of underwriting "red flags" were improperly ignored by Great American, invoking a duty of further inquiry, which was not fulfilled by Great American, including the Corestates loss suffered by Tri-State's predecessor, Executive Cash, for which coverage was denied, the rejection of Tri-State for coverage by another carrier at its inception in 1997, the disclosure of operational problems by the 1997 and 1999 Amsec surveys, the questions raised on the face of the Tri-State renewal applications, and the fact that AMSEC, on behalf of Great American, had difficulty in scheduling a survey of Tri-State facilities in 2000.

The trustee contends that the most "flagrant" of the red flags presented to Great

---

**27.** The CURE sheet also contained the following notation: "Competition from London on the acct. Try to stay competitive. Acct has had good loss history."

American was the June 2000 article, which represented "obvious warning signs that Tri–State was a 'sinking ship' suffering millions of dollars in unreported losses." As to the appropriate underwriting reaction to the article, Ralph testified that

at the very least there would have been a lot of questions about what Mr. Chesla's position with the firm was, when it ceased, whether there was a potential for some of these improprieties being involved with Tri–State, was it an employee or something other, did it involve any of Tri–State's or their customer's funds, whether or not Tri–State itself was being investigated, if there was something else related to the Chesla's [sic] or the Tri–State customers' money then there would be implications to the Great American policy.

Ralph opined that an underwriter exercising sound underwriting practices would have procured additional information "through internal or external sources". She found no such investigative information referenced in the underwriting file. Ralph opined further that among the actions that could have been taken were contact with law enforcement, a requirement that Tri–State's books be audited, and retrieval of the civil forfeiture complaints against the Cheslas mentioned in the article.

Describing an underwriting "red flag" as "basically something that causes you to question", and is "either the beginning of an issue or it can be an issue," Ms. Ralph reflected that the follow-up undertaken by Great American with respect to the "red flag" issues was "minimal or cursory at best", with "no conclusions reached and . . . no evidence that these items were

considered. . . . [calling into] question what information really was relied upon if they were not called to question and clarified." In her report, Ms. Ralph observes that

Once the policy is issued, the underwriter is accepting the risk and any deficiencies based on the scope of the coverage provided at the time of issuance, unless the policy is modified by endorsement. The underwriter's failure to ask questions of incomplete or missing information obtained during the underwriting process prior to issuance does not relieve its responsibility to respond in accordance with policy provisions once a claim occurs. If anything, industry practice would preclude an underwriter who conducted his analysis this way from later trying to avoid coverage for something he should have learned about during the pre-sale underwriting analysis.

By these comments,[28] Ms. Ralph asserts that industry practice places the burden on the insurer to follow up with the applicant for insurance to clarify the understandings and responses of the applicant, particularly where "there is a question as to whether there was an error [or] misunderstanding of the information requested in the application or some other reasons that questions in the application were answered as they were or not answered at all." According to Ms. Ralph, if the insurer does not meet its burden to follow up on so-called "red flags," and to employ accepted underwriting practices in reviewing renewal applications, the insurer may not reasonably rely on the representations or omissions in the application.

■ Ms. Ralph's concept of industry standards governing an insurer's obli-

---

**28.** I found no other reference in Ms. Ralph's testimony or report regarding industry standards about the types of indications or circumstances that would place an insurer on inquiry notice requiring an investigation, the absence or inadequacy of which would preclude reliance on the information in the insured's application.

gation to investigate does not comport with the legal framework in New Jersey on the issue of the respective obligations of insurers and insureds. In New Jersey, as between the insurer and the insured, the burden is on the insured to provide thorough and complete information on the insurance application. In *First American Title Ins. Co.*, the New Jersey Appellate Division explained that:

> irrespective of the insurer's investigative efforts, when asked a specific question in an insurance application, the insured's obligation is to respond truthfully. Simply put, "the prospective insured must not misrepresent or conceal information concerning risks entailed in coverage under an insurance policy." Consequently, even if one were to accept the contention that [the insurer] was negligent in failing to research the veracity of [the applicant's] responses, it is simply not the law that such negligence vitiates a later claim for misrepresentation.

351 N.J.Super. at 422, 798 A.2d at 670 (citations omitted). In *Lawson*,[29] the New Jersey Superior Court, Appellate Division, rejected the argument that the insurer could not rely on the insurance application because the application was incomplete, and the insurer failed to conduct its own "due diligence" investigation into the insured's qualifications. The court determined not only that the application was actually complete, but also that the insurer's duty to investigate is limited, and that "the applicant's duty to candidly fill out an insurance application is not in any way abated", whether or not an insurer performs an investigation. *Id.* at 421, 798 A.2d at 669.

On the issue of the insurer's duty to investigate, New Jersey courts have concluded that an insurer's duty to investigate "arises 'only when the independent investigation … discloses sufficient facts to seriously impair the value' of the application." *Ledley v. William Penn Life Ins. Co.*, 138 N.J. 627, 639, 651 A.2d 92, 97 (1995) (quoting *Gallagher v. New Eng. Mut. Life Ins. Co.*, 19 N.J. 14, 22, 114 A.2d 857 (1955)). Moreover,

> [t]he mere fact that an insurer makes an investigation does not absolve the applicant from speaking the truth nor lessen the right of the insurer to rely upon his statements, unless the investigation discloses facts sufficient to expose the falsity of the representations of the applicant or which are of such a nature as to place upon the insurer the duty of further inquiry.

*Id.* (quoting *John Hancock Mut. Life Ins. Co. of Boston v. Cronin*, 139 N.J.Eq. 392, 398, 51 A.2d 2, 5 (E & A 1947)). Where the falsity of the applicant's representations is not known by the insurer when the policy is issued, but where the insurer is aware of "red flags", New Jersey courts have consistently held that the insurer's failure to investigate more fully, or failure to investigate at all, will not vitiate the opportunity of the insurer to reasonably rely on the presumed truthfulness of the information in the application. For instance, in *Cronin*, the insurer knew at the time of the issuance of the policy that the applicant misrepresented certain information on his application, including his employment status (he was actually unemployed but stated that he was working), and whether he drank alcoholic beverages. The fact that the insurer did not inquire

---

**29.** On appeal, the New Jersey Supreme Court affirmed the Appellate Division decision that the legal malpractice policy at issue in the case may be rescinded as to the insured law firm and two of its members, but reversed as to the third member, who was innocent of wrongdoing. The Supreme Court did not address the issue of the due diligence of the insurer or its reasonable reliance on the application.

further into the applicant's medical history did not defeat the insurer's opportunity to reasonably rely on the information in the application. *Cronin,* 139 N.J.Eq. at 398, 51 A.2d at 5. Similarly, in *Gallagher,* the insurer was not charged with a duty to inquire further where the insurer knew that the applicant for a life insurance policy had a 70% chance of having a heart pathology condition, and where the insurer knew that the applicant had been turned down for life insurance by another insurance company. And in *Parker Precision Products Co. v. Metropolitan Life Ins. Co.,* 407 F.2d 1070 (3d Cir.1969), the Third Circuit, interpreting New Jersey equitable rescission doctrine, determined that a further duty to investigate did not arise, and the insurer could reasonably rely on the application, where inconsistencies between the application and a separate medical report submitted on behalf of the applicant did not seriously impair the value of "the insured's statements." *Id.* at 1075 (citing to *Gallagher*).[30]

In a recent unpublished New Jersey Appellate Division case, *Rutgers Cas. Ins. Co. v. Tabacki,* A–5303–01T5 (N.J.App. Div. April 16, 2003),[31] the court reversed the trial court's denial of the insurer's motion for summary judgment. The trial court declined to rescind an automobile insurance policy on the ground that the insurer could not have reasonably relied on the insured's statements that the vehicle sought to be insured was used only for personal transportation, where the insurer knew that the vehicle was commercially registered, where other questions regarding the vehicle's use arose, and where the insurer could have "quickly and easily" discovered the fact that the vehicle was actually used for commercial purposes. *Id.* at 12. The Appellate Division remanded the case to resolve the factual dispute of whether, by applicable industry standards, a prudent insurer would have conducted a further investigation to ascertain the actual use of the vehicle.

The *Rutgers* case is not inconsistent with the line of cases described above, including *Lawson, Cronin, Gallagher,* and *Parker Precision.* In none of these cases did the factual circumstances support the imposition of a duty to inquire on the insurer, or defeat the opportunity of the insurer to reasonably rely on the information provided by the applicant. The balance in these cases is always drawn in favor of

> the paramount duty of the insured to fully disclose all facts relating to . . . the application when such information is requested. It is he and he alone who has

---

**30.** In *Parker Precision,* the court not only concluded that no duty to inquire arose under the circumstances presented, but also that the applicant's negative but false response to the question of whether he had ever been treated for heart disease established reliance as a matter of law.

> The language of the crucial interrogatory . . . is straightforward and unequivocal. Implicit in such a question is the fact of reliance upon its answer, unless the insurer can be shown to have disregarded it in favor of medical tests which independently and reliably demonstrated its truth. No such test was available to [the insurer] here.

*Id.* at 1076. *Cf. Golden v. Northwestern Mutual Life Ins. Co.,* 229 N.J.Super. 405, 551 A.2d 1009 (App.Div.1988) (Issues of whether insurer relied on insured's representations rather than its own investigation, and whether an insurer's response to "red flags" was reasonable under the circumstances are fact questions for the jury.)

**31.** While R. 1:36–3 of the New Jersey Court Rules generally proscribes citation to unpublished opinions by courts, the *Rutgers Casualty* case was cited to this court by the trustee and served on all counsel in response to Great American's motion for summary judgment, and is not utilized here as precedential authority.

the necessary complete knowledge of such facts, and his statements and answers in the application are the determinant qualitative factor in the equation of insurability which the insurer has to resolve before issuing a policy.

*Gallagher,* 19 N.J. at 22, 114 A.2d at 862.

 Here, the "red flags" that were known by the underwriters at Great American at the time of the 1999 and 2000 renewals, either individually or collectively, did not absolve Tri–State from responding truthfully on the applications, did not lessen the right of Great American to rely on those statements, and did not place Great American on inquiry notice to defeat its reliance on those statements. Knowing what we know now, as a matter of 20–20 hindsight, one might piece together signs, from the inception of insurance coverage in 1997, through the 1999 and 2000 renewals, that further inquiry by Great American may have been advisable, but these signs at the time did not present a cohesive picture affording Great American knowledge of the falsity of the representations in the application, and did not substitute for the reliance Great American placed on the statements. These signs did not act to "seriously impair" the value of the Tri–State application. *See Ledley,* 138 N.J. at 639, 651 A.2d at 97. As noted above, the underwriting "red flags" described by the trustee included the following:

(1) *A substantial loss alleged to have been incurred by Tri–State's predecessor, Executive Cash to CoreStates in 1997, for which coverage was denied by the insurer for Executive Cash, Lloyds of London.* While Missal and Scheckton were advised about CoreStates' claim of loss against Ex-

ecutive Cash, the insurance broker from M & S, Ron Bray, described the loss as an accounting issue which was being resolved. No claim was ever made by CoreStates against Tri–State, either while it operated or after the bankruptcy was filed. On behalf of the trustee, Ms. Ralph opined that because Tri–State had nearly the same management team as Executive Cash, there may be some exposure to the new insurer arising out of the CoreStates loss. However, this hypothesis was unsubstantiated. Neither Tri–State nor any of its principals of Tri–State were ever implicated in connection with CoreStates' shortages.[32]

(2) *The rejection by Lloyds of London of coverage for the new entity in 1997.* The Great American underwriters testified that there are many reasons why an insurer may decline to extend coverage, and that fact does not necessarily invoke heightened scrutiny of a new insurance application.

(3) *Significant problems noted by AMSEC after a survey of Tri–State's Hammonton facility in September 1997, with a recommendation for a follow-up investigation by AMSEC that was not performed.* The quotation for the insurance coverage issued by Great American in October 1997 was conditioned upon compliance with the survey recommendations within 60 days. If the recommendations were not complied with, the carrier reserved the right to cancel the coverage. In accepting the conditions, Mottin noted in writing that many of the recommendations had already been implemented, and the remaining issues were expected to be resolved within 60 days. Missal requested Bray to keep him in-

---

**32.** On February 19, 2004, Daniel Antolini, the owner and operator of Executive Cash, was found guilty of bank fraud in connection with the conversion of CoreStates Bank funds for his own benefit, and for the benefit of Execu-

tive Cash, from July 1995 through May 1997. There is no evidence in the record that Antolini's conversion of Executive Cash funds impacted upon Tri–State.

formed about the progress made by Tri–State in complying with the recommendations. No AMSEC follow-up occurred.

While Ms. Ralph was critical about the fact that no formal follow-up to the 1997 survey occurred, AMSEC representatives testified that they were rarely asked by insurers to follow up on risk assessment surveys. In addition, the written exchanges between Tri–State, Bray and Missal evidence a cooperative effort by Tri–State to correct the deficiencies identified in Tri–State's operating procedures by the 1997 survey. Missal testified that AMSEC survey recommendations represent a "perfect world scenario", that would enable the insurer to "do everything and spend as much money as [one] could on this account". The underwriter's job is to tailor the survey recommendations to what is actually achievable.

(4) *Three consecutive years in which Tri–State showed a change in management on its renewal application.* Ms. Ralph opined that a change in management should generate inquiries about the reasons for the change, the impact on operations and controls, the experience of new management, etc. Missal responded that a wholesale change in management might raise a question, but the departure or change of position of a particular officer does not raise a significant underwriting issue. In the first three applications, from 1997 to 1999, Mottin appears as president and Feuker appears as vice president. In 2000, Basile is president, Mottin is "CEO", and Feuker is still listed as vice president. Mottin and Feuker continued to be noted as significant members of the Tri–State management team from the formation of the company in 1997 through the 2000 renewal application. The consistency of the key members of the management team weakens significantly the status of this issue as a "red flag" that would defeat the insurer's reliance on the applications.

(5) *Three consecutive years with identical answers to the issues of claims and losses on the Tri–State renewal applications.* Although both Scheckton and Missal testified that a report of no losses over a period of years was not unusual in the armored car business,[33] simple logic dictates that identical responses on the "Loss History" portion of the renewal applications over a period of years would prompt a question to the insured to confirm the accuracy of the information that there were no losses. Stephanie Hoboth, an underwriter in the same department at Great American, testified that where the same answers are provided by an insured year after year, she will seek written confirmation that the information is correct. Ms. Ralph also reflected that underwriting standards would deem advisable the confirmation of the information provided. However, to conclude that confirmation of such information by the underwriter may be advisable is not the same as concluding

**33.** The Intervening Defendants highlight the discrepancy between the testimony of Missal, the underwriter, and the testimony of William F. Marston, Assistant Vice President and Director of Fidelity and Crime at Great American, about another Great American insured, Soto Enterprises. Missal testified that Soto Enterprises never sustained a loss over the course of several years. In contrast, Marston recalled that Soto Enterprises presented a claim that was paid by the company. The focus here, however, is not whether Soto Enterprises experienced any losses. Rather, the focus is on whether the fact that the Loss History on Tri–State's renewal applications had identical responses for three years constitutes a "red flag" that would place Great American on inquiry notice to defeat Great American's reliance on the applications. To the extent that the discrepancy between the testimony of Missal and Marston reflect on the credibility of their testimony in general, I take that into account herein.

that such a circumstance constitutes a "red flag" that would shift the burden of truthful response to the insurer to conduct an appropriate inquiry.

(6) *Information that some time during the year 2000, Great American directed AMSEC to conduct a follow-up survey of Tri–State, but that Tri–State did not cooperate in scheduling a survey.* Mark Lowers, the president of AMSEC, testified that as a general matter, usually at the beginning of the calendar year, Great American forwarded a list of risk assessment surveys to be accomplished that year. AMSEC would then contact the respective insureds to schedule surveys. Lowers recalled that Tri–State appeared on Great American's planned survey list for 2000.[34] While Lowers reflected that scheduling surveys is often difficult with independent operators, and his memory was vague about the timing of AMSEC's scheduling attempts, he recalled a conversation with Scheckton or Missal, which he believed occurred before June 2000, in which he shared his perception that Tri–State was not cooperating in scheduling a survey and during which he sought their assistance to enlist Tri–State's insurance broker to pressure Tri–State to schedule a survey.

I am unable to assign much weight to the contention by the trustee that Tri–State's failure to cooperate in scheduling a survey constituted another "red flag" that should have placed Great American on inquiry notice. The memory of the witnesses, particularly Lowers, about the details of the contacts with Tri–State and Great American was weak, and there was no documentation of such contacts. While Lowers remembers talking "briefly" to Scheckton or Missal about Tri–State's lack

of cooperation, he did not recall whether Great American followed up in any way with Tri–State or with AMSEC, he did not recall whom he spoke with at Great American after the first conversation, and he could not find any notations in the AMSEC files about such contacts.

The "red flags" described above cannot serve to charge Great American with knowledge of the true facts regarding the losses at Tri–State, or the falsity of the responses of Tri–State to the "Loss History" section of the 1999 and 2000 renewal applications. These indications were relatively inconsequential and remote, and do not support the expert opinion offered by the trustee that the minimal or cursory consideration afforded to these matters calls into question "what information really was relied upon if they were not called to question and clarified."

▪▪ The June 2000 article forwarded to the underwriters at Great American by Amsec requires greater scrutiny. To explain Great American's response, Scheckton reflected that when he first saw the article on or about June 22, 2000, he was struck by the date of the article—June 10. Nearly two weeks had passed since the article appeared, and he had heard nothing about problems at Tri–State until Lowers' fax was received. He had no information about any arrests, and received no calls or inquiries from anyone, including Tri–State customers. According to Scheckton, the armored car insurance community "is a very small community and it is a very gossipy community." Scheckton testified that in another instance where an insurance policy was cancelled for non-payment, the customers immediately closed their accounts and moved their business.[35]

**34.** The list of surveys requested by Great American directed to AMSEC during the year

2000 was not located by either AMSEC or Great American.

**35.** In fact, Scheckton noted that when Tri–

Scheckton directed Missal to call Ron Bray and have him contact the owners because, as a general matter, the broker represents the insured, and the insurer does not contact the insured directly. Scheckton believes that he spoke with Mark Lowers and Bill Marston, the claims adjuster at Great American, about whether they knew anything about this. They did not. He focused on the aspects of the article that stated that Tri–State was not under investigation and that Chesla was no longer a shareholder in Tri–State.

I conclude that while the contents of the June 2000 article were sufficient to induce an inquiry by Great American, the insurer conducted that inquiry with reasonable thoroughness under the circumstances. Particularly noteworthy was the fact that following the publication of the article, there was no indication from any source of any problem or any losses at Tri–State. Rather, there was a direct and complete denial by Mottin, still president of Tri–State at the time, to the specific inquiry by Tri–State's broker, at the insurer's direction, about whether Tri–State had experienced any losses. The trustee is certainly correct that the Great American underwriters could have investigated the veracity of Tri–State's responses more vigorously. However, even if we accept the contention, which is not necessarily established on this record, that Great American was negligent in researching the veracity of Tri–Stat's response to the inquiry about the article, "it is simply not the law" that such negligence vitiates Great American's rescission claim. *Lawson*, 351 N.J.Super. at 422, 798 A.2d at 670. Like the so-called "red flags" described above, the receipt of the June 2000 article by Great American, which

prompted an inquiry to the insured, who denied that Tri–State suffered any losses, did not defeat the opportunity of Great American to rely on Tri–State's representations.

■ As to the broader issue of Great American's underwriting practices, the trustee and the Intervening Defendants describe Great American's underwriting procedures as "reckless" and "bizarre", characterized by "an ad hoc amalgam of 'gut' reaction and case-by-case decisions made without reference to objective criteria." They highlight the failure by Great American to conform to industry norms, standards and practices to support the theory that the deficiencies defeat the reasonableness of Great American's reliance on any misrepresentations in Tri–State's renewal applications.

I readily agree that a strong showing has been made that Great American's underwriting procedures were seriously flawed. However, diligent and careful underwriting benefits the insurer and is intended to assess, control and limit risk. *See, e.g.*, Gary Schuman, *Health and Life Insurance Applications: Their Role in the Claims Review Process*, 62 DEF. COUNS.J. 225, 227 (1995) (" 'Underwriting' is the process that an insurer uses to determine whether, and on what basis, it will accept an application for insurance."). Underwriting is not intended to benefit the insured. *Id.* at 225 (underwriting serves to ensure "not equal treatment of policyholders, but equitable treatment based on the risk that applicants represent to the insurer"), and varies widely among insurers, who are free to insure substandard risks. The trustee has failed to cite any New Jersey authority, nor have I found any such source, to support the theory that an

State closed its doors in February 2001, many of the Tri-State customers called frantically to express their concerns.

insurer who engages in poor underwriting practices may not rescind a policy if the insured has misrepresented material information in the policy. *See, e.g., Morgan, Olmstead, Kennedy & Gardner, Inc. v. Schipa,* 585 F.Supp. 245, 249 (S.D.N.Y. 1984) ("the defendant is in essence saying that 'because your negligence allowed me to defraud you or to continue to defraud you, you should not be allowed to recover from me to the extent that a reasonable person would not have allowed me to defraud him.' Such a defense is patently unfair and unjustifiable as a matter of law."); *Jewish Center of Sussex County v. Whale,* 86 N.J. 619, 626 n. 1, 432 A.2d 521, 524 n. 1 (1981) ("One who engages in fraud ... may not urge that one's victim should have been more circumspect or astute.").

Here, the insured cannot escape the consequences of misrepresenting material facts on the 1999 and 2000 renewal applications because the underwriting of these applications was flawed. In each of the applications at issue here, above the signature line is the following affirmation:

> I/WE HEREBY DECLARE THAT THE ABOVE INFORMATION IS TRUE AND I/WE HAVE NOT SUPPRESSED OR MISSTATED ANY MATERIAL FACTS TO THE BEST OF MY/OUR KNOWLEDGE.

In fact, the information provided was materially false and the insurer actually and reasonably relied on the contents of the application. The trustee's concerns about Great American's underwriting practices are insufficient to overcome Tri–State's misrepresentations on the bond renewal applications.

### b. Post–Loss Underwriting.

Finally, the trustee and the Intervening Defendants assert that the vigorous and aggressive investigative measures employed by Great American following notice from Tri–State on or about February 26, 2001 that Tri–State was closing its doors, all clearly designed to defeat coverage on the policy, constituted impermissible post-loss underwriting, which serves to confirm that Great American did not reasonably rely on the renewal applications, and cannot now rescind the policies. While the trustee certainly established that Great American conducted a thorough and intensive investigation of the Tri–State loss, which was "very slanted" in favor of defeating coverage on the Tri–State policy, the trustee has not succeeded by this theory to defeat Great American's reasonable reliance on the 1999 and 2000 renewal applications.

Great American received direct notification about the potential loss at Tri–State on or about February 26, 2001, when Basile called Marshall & Sterling and notified them that customers were claiming substantial cash shortages and that Tri–State was shutting down its operations. In turn, Marshall & Sterling notified Great American. The following day, at Great American's request, Robert Osborne, an AMSEC investigator, began his investigation at Tri–State's Hammonton office.

One of the first exchanges from AMSEC representatives to William Frank Marston, Assistant Vice President at Great American, and the claims adjustor on the file, was a facsimile transmission dated February 27, 2001, which attached the June 10, 2000 article. Apparently, Marston faxed the article to Stephanie Hoboth, another underwriter at Great American with a request that she "please look at prior years apps".

Ralph testified that it is highly unusual to ask for underwriting information when a loss is reported, because the application would have little value in "responding to a claims situation at the onset". The fact that the June 2000 article was sent to

Marston at the outset of the investigation was noteworthy because

[b]oth Mr. Missal and Mr. Scheckton said that the article and the information was [sic] not relevant to them at the time the 2000 renewal application was reviewed, but then it became a very focal point shortly after the claim became known, and ... [the claims process began by] the review of the applications, looking at the underwriting information in those applications before even there was a determination of what the claims issues were or what the policy would cover.

Shortly after the AMSEC investigation began, Marston retained counsel, Donald West, to advise Great American on the claim. By March 12, about two weeks into the investigation, Scheckton emailed a message to Great American's reinsurer on the Tri–State policy, copying Marston and others, that "[w]e have not yet told the trustee that we will most likely rescind the policy back to inception."

During the next several months, AMSEC conducted an extensive investigation, interviewing many former Tri–State employees, contacting law enforcement and generating a multitude of reports for Great American.[36] From the early days of the investigation, the notes of the lead AMSEC investigator, Robert Osborne, reveal that the focus of the investigation was *to find policy exclusions and grounds for rescission.* For instance, at a meeting held during the first two or three weeks of the investigation, Osborne's notes pose the questions of "wh[at] do we need estab. on behalf of Gt. Amer.", and reflect upon the "policy exclusion issue" and "other principles [sic] involvement in theft." While Osborne and his AMSEC supervisor James

Beatty acknowledged that quantifying the loss on a claim is customary, a decision was made by Marston not to pursue the quantification of Tri–State losses. By April 6, Donald West, the attorney retained by Marston, forwarded a "Summary of Case" to Marston, in which he outlined grounds for denial of coverage, including rescission and policy exclusion.

On June 4, 2001, Great American filed this adversary proceeding seeking declaratory judgment to rescind the insurance policy and to declare that there was no insurance coverage. Prior to the filing of the declaratory judgment action, Great American had not communicated to the trustee in any way that there was a coverage issue on the policy. The trustee answered the complaint and filed a counterclaim on July 16, 2001 seeking coverage under the bond, and sanctions against Great American for bad faith denial of coverage.

On behalf of the trustee, Ralph highlighted what she considered to be serious deviations from industry standards on the adjustment of claims, and *strong indications* of Great American's intention, from the beginning, to deny the Tri–State claim. She noted that the investigators looked first at the applications before they looked at the policy, retained legal counsel at the inception of the investigation, failed to notice the trustee of the questions being raised, determined not to attempt to quantify the loss, and decided that rescission was likely within two weeks of notification of the claim.

It must be recalled that when the investigation began in late February 2001, Marston and Osborne found a very chaotic situation at Tri–State. The business had

**36.** The AMSEC Reports were admitted for limited purposes only, and not for the truth of the matters asserted therein.

ceased operating, and the cash from the few other Tri–State locations (over $19 million) was being delivered to the Hammonton headquarters. On March 2, 2001, Mottin, the CEO of the company as of October 2000, and formerly the president as well as the majority shareholder, was arrested. On March 12, Feuker, also a shareholder and officer of the company, pled guilty to criminal charges in federal court. AMSEC issued its first extensive investigative report to Great American on March 23. In light of these circumstances, the prospect that one or more policy exclusion provisions, or rescission of the policies, might be available was evident from the outset. Great American was not precluded from investigating these matters as aggressively as they did.

Again, no New Jersey authority has been cited or found for the proposition that underwriting deficiencies prior to policy renewal, followed by aggressive post-loss investigation aimed at supporting coverage denial, defeats the reasonable reliance element required for equitable rescission. In New Jersey, the emphasis is on the obligation of the applicant to provide truthful and complete answers to questions on an insurance application. While authority exists elsewhere for the proposition that "post-claim underwriting" may weaken the opportunity of an insurer to claim reasonable reliance on misrepresentations, in an insurance application,[37] New Jersey case law does not support that result.

Here, under applicable New Jersey law, the designation of Great American's post-claim investigation as "post-loss underwriting" does not serve, either alone or in conjunction with the flawed underwriting on the 1999 and 2000 renewals, to defeat Great American's reasonable reliance on the insured's applications.

For purposes of establishing the requisite elements of equitable fraud, Great American has met its burden to demonstrate that it actually and reasonably relied on Tri–State's representations in the 1999 and 2000 renewal applications that it had not incurred any claims, had no occurrences that could lead to claims, and had no losses over the course of the previous five years.

#### 4. Public Policy Considerations.

■■■ The trustee contends that even if the basic elements of equitable fraud are established on this record, public policy considerations require the balancing of the equities in favor of the innocent parties who would be negatively impacted by the rescission of the Great American policies. In *Lawson*, the New Jersey Supreme Court recognized that rescission is "an equitable remedy, which properly depends on the totality of circumstances in a given case and resides within a court's discretion." 177 N.J. at 143, 827 A.2d at 241. The court quoted *Intertech Assocs., Inc. v. City of Paterson*, 255 N.J.Super. 52, 59, 604 A.2d 628 (App.Div.1992) for the propo-

---

**37.** The practice of "post-claim underwriting" occurs when an insurer issues policies

after only superficial underwriting to realize large amounts of premium income, and then attempts to deny coverage on the grounds of misrepresentation by engaging in aggressive investigation of the risk after the insured makes a claim. Courts often criticize this practice as unfair because post-claim underwriting allows an insurer to accept income generated from questiona-

ble policies while knowing that the insurer may, at a later date, raise inaccuracies in the application as a means of avoiding liability on at least some of the purportedly insured risk. (citations omitted)

Franklin D. Cordell, *The Private Mortgage Insurer's Action for Rescission for Misrepresentation: Limiting a Potential Threat to Private Sector Participation in the Secondary Mortgage Market*, 47 Wash. & Lee L. Rev. 587, 598 (1990).

sition that " '[e]ven where grounds for rescission exist ... the remedy is discretionary.' " *Id.* at 143–44, 827 A.2d at 241. The *Lawson* court determined to rescind the legal malpractice coverage of the law firm which, through one of the partners, made material misrepresentations on its insurance application, and to rescind the policy covering two of the three partners of the firm, each of whom knew about the misrepresentation. The policy covering the third partner, Snyder, who did not participate in any misappropriations or misstatements, and had no knowledge of such activities, was not rescinded. To balance the equities in favor of retaining in effect the policy as to Snyder, the court considered the fact that the law firm operated as a limited liability partnership under the Uniform Partnership Law, N.J.S.A. 42:1–1 to 49, ("UPL"),[38] which shields partners from incurring liability arising solely from the wrongful acts of fellow partners. *Id.* at 138–40, 827 A.2d at 237–38. "[V]oiding Snyder's coverage solely because of his partners' wrongful conduct potentially would expose Snyder to uninsured liability in a manner inconsistent with his expectations under the UPL". *Id.* at 142, 827 A.2d at 240. As well, leav[ing] members of the public, whom Snyder had represented throughout that period, unprotected even though the insured himself committed no fraud ... [would be a] harsh and sweeping result ... contrary to the public interest. More specifically, it would be inconsistent with the policies underlying our Rules of Court that seek to protect consumers of legal services by requiring attorneys to maintain adequate insurance in this setting. *Id.* at 143, 827 A.2d at 240–41.

The determination of the *Lawson* court to reject rescission of the malpractice in-

surance policy in effect as to Snyder cannot be applied to the circumstances presented here. In *Lawson*, Snyder was an innocent partner directly insured by the insurer. Coverage was procured for him individually, as well as for the law firm as a whole. No misrepresentations were made as to him. Under the limited liability partnership, Snyder was not responsible for the wrongdoing of his law partners.

In contrast, the only insured under the Great American policy was Tri-State. Customers of Tri-State were not insured directly. Regardless of their lack of wrongdoing and reliance on the existence of insurance coverage, the customers of Tri-State may only receive the benefit of coverage if Tri-State has coverage in place. As distinguished from the *Lawson* facts, where the interests of an innocent insured and innocent consumers of legal services were presented, this circumstance is closer to "the more typical contract case", *Id.*, in which case rescission is appropriate where material misrepresentations were made by the insured, on which the insurer relied to issue coverage. It is "firmly embedded in the jurisprudence of this State ... (citation omitted) that a policy may be rescinded and benefits denied to the innocent intended beneficiary based on material misrepresentations, even when the misrepresentations are innocent." *Palisades Safety & Ins. Ass'n v. Bastien*, 175 N.J. 144, 151, 814 A.2d 619, 624 (2003). Implicated here is the "strong public policy [in New Jersey] against the proliferation of insurance fraud." *Id.*

The trustee contends that under the "totality of circumstances" test applied by the New Jersey Supreme Court, "which incorporates concerns for innocent members of

38. The UPL was in effect when the underlying facts in *Lawson* arose, but was repealed and replaced by the Uniform Partnership Act, N.J.S.A. 42:1A–1 to 56, L.2000.

the public and the intended protective purpose of the insurance policy", rescission of the insurance contract should be rejected here. It is certainly true that Great American affirmatively promoted to the cash handling industry its purported expertise in risk control and assessment, that Great American's underwriters were well aware that the purpose of Great American's policies was to protect third-party customers' property, and that these customers would not do business with armored car companies like Tri–State unless an insurer like Great American had assessed the risk and issued insurance protection for their funds. As well, Great American underwriters were aware that some state regulators required customer property to be insured as a matter of law. The trustee contends that in light of these circumstances, and the protective purpose of the insurance coverage, "Great American's underwriters should be held to a higher than ordinary standard of due diligence in their assessment of risks like Tri–State".

The trustee's contention in this regard must be rejected. The *Lawson* court was not focused on the motive or extent of underwriting performed by the insurer. It focused on the innocent insured, who was entitled under the circumstances to retain coverage. Here, we have innocent Tri–State customers who will not be able to look to insurance coverage to cover their losses. But Tri–State itself, the insured on the policy, forfeited its right to coverage by failing to disclose its losses over the years. The so-called "public policy" exception to rescission must fail.

B. Great American's Bad Faith.

In Counts Three, Six and Seven of the trustee's amended counterclaim, the trustee seeks compensatory and punitive damages against Great American, contending that Great American conducted its claims investigation process in a deceptive and misleading manner, and wrongfully denied coverage to Tri–State under the policies issued.

As noted earlier, on March 2, 2001, Tri–State filed for bankruptcy, and Thomas J. Subranni, Esquire, the Chapter 7 trustee, was appointed. Three days later, on March 5, 2001, the trustee provided written notice to Great American of a potential claim "arising from covered losses suffered by Tri–State," and requested advice regarding "anything else that needs to be done regarding this claim." Subranni testified that Marston met with him in early March, was very cooperative and "couldn't do enough to help me." On March 12, the same date that the email from Scheckton to the reinsurer was sent reflecting the prospect of contract rescission, Marston advised Subranni in writing that a proof of loss must be filed within 120 days of the discovery of the loss, acknowledging that the timeframe "probably wouldn't be possible in this case", and suggesting that the trustee seek an extension in writing.

On April 12, 2001, the trustee requested a 90 day extension of the 120 day period to file a proof of claim, until September 28, 2001. By letter dated April 18, 2001, Marston responded as follows:

> As far as you are concerned, it seems to me that discovery [of the loss] took place on or about March 1, 2001. That being the case, Tri–State has until July 27, 2001 to submit the proof to us, rendering an extension unnecessary at present. If, in late June or early July, you still feel you will need an extension, we can then consider the question.

The trustee followed up Marston's response with a letter dated April 24, 2001 seeking to designate his request for extension until September 28, 2001 "as a continuing request."

The first notice to the trustee that any issues had arisen regarding coverage under the Great American policies came in the form of Great American's complaint for declaratory judgment to rescind the insurance policy, filed on June 4, 2001.

The following year, on June 18, 2002, the trustee notified Marston that he was prepared to file a preliminary proof of loss, and requested a proof of loss form. The proposal to file a "preliminary proof of loss" was rejected by Great American's counsel by letter dated June 26, 2002, with an indication that a proof of loss was then "out of time."

According to the trustee, the cooperative attitude evidenced by Great American toward the trustee during the claims investigation in March, April and May 2001, and the failure of Great American to notice the trustee of the issues which had arisen regarding coverage, were attempts by the insurer to lull the trustee into continuing to cooperate with Great American in its investigation, and to retain unencumbered access to Tri–State witnesses and documents during the investigation. The trustee claims that Great American failed to meet its duties and responsibilities in their handling of claims by Tri–State in the following ways:

Did not provide proper written notification of reservations of rights, including full description of policy provisions relied upon;

Did not provide proper written declination of claims with specific reasons and policy references;

Decided rather than to send disclaimer notice that it would file suit;

Gave the trustee information that indicated that extension for filing of proof of loss was understandable considering the circumstances and would not be unreasonably withheld;

Despite not having provided notice of intent to deny coverage, proceeded with investigation so that it could assist in the criminal investigations and develop the case for denial without resistance from the insured or witnesses;

Instructed and/or allowed AMSEC to conduct an investigation with bias to find reasons to decline the loss;

Put the reinsurer on notice of its intent to rescind coverage on March 12, 2001, without having provided proper written notice to insured;

Failed to properly investigate the loss by not attempting to quantify loss as directed by Mr. Marston;

Failed to explore possibility of coverage as respects disappearance claim;

Failed to review underwriting file during investigation and prior to denial of coverage even though information used as a basis for denial was presumed to be from such file;

Failed to properly notify insured of coverage determination as provided to Great American by Mr. West in March and April of 2001, and

Hired an attorney to oversee and direct claims investigation with an eye towards denying the claim from the outset.

■ The trustee's quest for consequences against Great American for the manner in which it conducted its claim adjustment activities must fail for several reasons. First, as noted above, Great American was entitled to conduct a vigorous investigation of the Tri–State claim, particularly in light of the chaotic circumstances surrounding the loss, and the fact that two of Tri–State's principals faced criminal charges within the first two weeks of the investigation.

■ Second, the trustee is certainly correct that Great American owes to its insureds, including Tri–State, a duty to

investigate claims in good faith, and to communicate problems and concerns to the insureds as they arise. Ralph testified convincingly that industry standards require the insurer to place the insured on notice of coverage issues to enable the insured to protect its interests from the outset. However, Ralph was not able to articulate any negative impact of Great American's actions on the trustee or on Tri–State's claim, or any specific way in which the trustee was not able to protect the interests of the Tri–State estate. She testified that the filing of the declaratory judgment complaint instead of direct notification to the trustee was "not appropriate" and "not equitable." If Subranni had been notified directly at an earlier date, "[i]t would have saved a lot of time and energy and a lot of grief." Subranni "could have taken other actions to explore those issues, whether they were founded or not, and set a path to determine how this was going to affect his coverage." Ralph acknowledged that Subranni consulted special insurance counsel in late March and submitted an application to retain such counsel in early April. No specificity was provided in terms of what "other actions" would have been taken, or how the outcome of the claim adjustment process would have differed if the trustee had been apprised by Great American at an earlier date, or by letter, that there were coverage issues and that coverage would be denied.

Third, the causes of action relied on by the trustee, including violation of the New Jersey Consumer Fraud Act (Third Count), breach of the covenant of good faith and fair dealing (Sixth Count), and breach of fiduciary duty (Seventh Count) do not support the opportunity of the trustee to recover against Great American on this record. Each of these causes of action are reviewed below.

### 1. New Jersey Consumer Fraud Act.

■ In Count 3 of his counterclaim, the trustee contends that Great American violated the New Jersey Consumer Fraud Act. Specifically, the trustee contends that Great American's refusal to pay the trustee's claim constitutes an unconscionable commercial practice under N.J.S.A. 56:8–2.

The New Jersey Consumer Fraud Act, N.J.S.A. 56:8–1 *et seq.* prohibits the "act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon [the act] . . . in connection with the sale or advertisement of any merchandise or real estate." N.J.S.A. 56:8–2. The Act's definition of "person" includes business entities, N.J.S.A. 56:8–1, and under New Jersey law, it has been held "that a corporation may qualify as a person under the Act when it finds itself in a consumer oriented situation." *BOC Group, Inc. v. Lummus Crest, Inc.,* 251 N.J.Super. 271, 277, 597 A.2d 1109, 1112 (Law Div.1990). *See also Naporano Iron & Metal Co. v. American Crane Corp.,* 79 F.Supp.2d 494 (D.N.J.1999) (corporate purchaser of crane had claim against manufacturer under the Act). New Jersey courts have, however, "recognized the 'need to place reasonable limits upon the operation of the Act despite broad statutory language so that its enforcement properly reflects legislative intent.' " *Id.* (quoting *DiBernardo v. Mosley,* 206 N.J.Super. 371, 375, 502 A.2d 1166 (App.Div.1986)). In this regard, the courts tend to focus on "the character of the transaction rather than the identity of the purchaser." *J & R Ice Cream Corp. v. California Smoothie Licensing Corp.,* 31 F.3d 1259, 1273 (3d Cir.1994); *Electric Mobility Corp. v. Bourns Sensors/Con-*

*trols, Inc.*, 87 F.Supp.2d 394, 400 (D.N.J. 2000).

■ The sale of an insurance policy is covered under the New Jersey Consumer Fraud Act. *See Stewart Title Guar. Co. v. Greenlands Realty, L.L.C.*, 58 F.Supp.2d 370, 390 (D.N.J.1999); *Lemelledo v. Beneficial Management Corp. of Am.*, 150 N.J. 255, 265, 696 A.2d 546 (1997) ("[O]ur reading of the [NJUTPA] convinces us that the statute's language is ample enough to encompass the sale of insurance policies as goods and services that are marketed to consumers."). However, for two reasons, I conclude that the trustee does not have recourse under the Consumer Fraud Act in this case.

First, the Comprehensive Employee Dishonesty, Crime and Disappearance Insurance Polices at issue here are not the types of insurance policies generally "available to the public at large and sold in large quantities." *BOC Group*, 251 N.J.Super. at 279, 597 A.2d at 1113. This is not the typical type of insurance purchased for the protection of an individual consumer, but rather a specialized business oriented insurance contract. *See, e.g., J & R Ice Cream Corp. v. California Smoothie Licensing Corp.*, 31 F.3d 1259, 1273 (3d Cir. 1994) (purchase of a franchise is not a "consumer oriented situation").

■ Second, even assuming that this type of insurance policy was covered by the Act, the "mere denial of insurance benefits to which the [insured] believed they were entitled does not comprise an unconscionable commercial practice." *Van Holt v. Liberty Mut. Fire Ins. Co.*, 163 F.3d 161, 168 (3d Cir.1998). *See also Optica, Inc. v. Metro Public Adjustment, Inc.*, No. Civ.A. 03–5065, 2005 WL 1719134, *12 (D.N.J. July 21, 2005) ("The breach of an enforceable insurance contract does not constitute a violation of New Jersey's Consumer Fraud Act."). "New Jersey courts that have decided the issue have consistently held that the payment of insurance benefits is not subject to the Consumer Fraud Act." *Id. See, e.g., Kuhnel v. CNA Ins. Companies*, 322 N.J.Super. 568, 731 A.2d 564 (App.Div.1999), *certif. denied*, 163 N.J. 12, 746 A.2d 458, *cert. denied*, 531 U.S. 819, 121 S.Ct. 61, 148 L.Ed.2d 27 (2000) ("The issues here involve the receipt of benefits, issues which have been held to be beyond the scope of the CFA.").

The trustee's contention that Great American's refusal to pay the trustee's claim constitutes an unconscionable commercial practice under the Consumer Fraud Act is therefore not supportable under New Jersey law. Count 3 of the trustee's counterclaim is dismissed.

### 2. Breach of Duty of Good Faith and Fair Dealing.

■ In Count 6 of his counterclaim, the trustee asserts that Great American breached its duty of good faith and fair dealing. The trustee contends that Great American failed to honor its obligations by (1) denying claim coverage and forcing the trustee into expensive litigation; (2) failing to provide a reasonable basis for denial; (3) conducting its loss investigation in a deceptive and misleading manner and engaging in post loss underwriting; (4) using attorneys as claims adjusters to improperly claim privilege; (5) not disclosing the results of its investigation; (6) failing to disclose the agency relationship between Great American and Marshall & Sterling, Inc., and (7) utilizing ambiguous and deliberately misleading application forms.

■ The New Jersey Supreme Court has recognized that every contract in New Jersey contains an implied covenant of good faith and fair dealing. *R.J. Gaydos Ins. Agency, Inc. v. National Consumer Ins. Co.*, 168 N.J. 255, 773 A.2d

1132 (2001); *Pickett v. Lloyd's,* 131 N.J. 457, 467, 621 A.2d 445, 450 (1993). However, *a fortiori,* an implied covenant only arises where there is a contractual nexus between the parties. In this case, I have determined that Great American is entitled to rescission of the insurance policies at issue here. Because there is no contractual relationship between Great American and the debtor, there can be no implied covenant of good faith and fair dealing.

■ In *Pickett v. Lloyd's,* the New Jersey Supreme Court recognized that "[m]ost jurisdictions have characterized a cause of action for bad-faith failure to pay an insured's claim as a tort that arises out of the implied duty of an insurance company to deal fairly and act in good faith in processing the claims of its policyholder." 131 N.J. at 469, 621 A.2d at 451. The Court ultimately agreed that "[a]n insurance company's breach of the fiduciary obligation imposed by virtue of its policy, by its wrongful failure to settle, 'sounds in both tort and contract,'" *Id.* at 470, 621 A.2d at 452 (quoting *Rova Farms Resort Inc. v. Investors Ins. Co.,* 65 N.J. 474, 504, 323 A.2d 495 (1974)), although it added that "the cause of action is best understood as one that sounds in contract." *Id.* To devise a remedy, the Court adopted the "fairly debatable standard" whereby "a claimant who could not have established as a matter of law a right to summary judgment on the substantive claim would not be entitled to assert a claim for an insurer's bad-faith refusal to pay the claim." *Id.* at 473, 621 A.2d at 454.

Under *Pickett,* the trustee would be able to assert a cause of action for Great American's bad faith failure to pay his claim if he could first establish a right to summary judgment as to his underlying claim. *See Tarsio v. Provident Insur. Co.,* 108 F.Supp.2d 397 (D.N.J.2000) (because there were genuine issues of material fact as to underlying claim, claim for bad faith was dismissed). Here, we have already determined that Great American is entitled to rescission and that the trustee's underlying claim for coverage has been dismissed. Because the trustee would not be entitled to summary judgment in favor of his claim, the trustee's bad faith tort claim under *Pickett* is denied. Count 6 of the trustee counterclaim is dismissed.

### 3. Breach of Fiduciary Duty.

■ In Count 7 of his counterclaim, the trustee asserts a breach of fiduciary duty. The trustee contends that each of the Comprehensive Insurance policies sold to Tri–State created a fiduciary relationship between Great American and Tri–State. The trustee reiterates the same list of violations as noted in Count 6, in which he alleged a breach of the duty of good faith and fair dealing.

■ Under New Jersey law, a fiduciary relationship can arise between an insurer and an insured "in special circumstances." *Ellmex Const. Co. v. Republic Ins. Co.,* 202 N.J.Super. 195, 206, 494 A.2d 339, 345 (App.Div.1985), *certif. denied,* 103 N.J. 453, 511 A.2d 639 (1986). For example, the insurer may reserve the right to settle a third party claim, thus implying a fiduciary obligation. *See, e.g., Rova Farms Resort, Inc. v. Investors Ins. Co. of America,* 65 N.J. 474, 492, 323 A.2d 495 (1974); *DiSalvatore v. Aetna Cas. and Sur. Co.,* 624 F.Supp. 541 (D.N.J.1986). However, "[t]he mere presence of a fiduciary duty regarding one aspect of the insurance contract does not necessarily require that such a duty govern all aspects of the agreement." 202 N.J.Super. at 206, 494 A.2d at 345. In the context of benefit or claim analysis, the parties are operating in the normal contractual posture, not as principal and agent. There are only the

normal contractual obligations, not those of a fiduciary. *Id. See also Kocse v. Liberty Mut. Ins. Co.*, 152 N.J.Super. 371, 379, 377 A.2d 1234, 1237 (Law Div.1977) ("Certainly, an insurer's task of determining whether the insurance policy provided coverage ... cannot be deemed to give rise to such a duty on the part of the insurer.").

■ Here we have no assertion of special circumstances to impose a fiduciary relationship between Great American and Tri–State. In fact, even if we labeled the relationship between Great American and Tri–State as a fiduciary relationship, that label does not signify that by its aggressive investigative efforts, its "slanted" claims adjustment processes, and its failure to promptly alert the insured of coverage problems, that Great American breached its fiduciary duty to Tri–State. Such a conclusion may have been reached if Great American wrongfully denied coverage to Tri–State. However, I have determined that Great American may properly rescind the contract with Tri–State. As with Count 6 above, the rescission of the policies signifies that the contractual relationship between the parties has been voided from inception, voiding as well any fiduciary duties that may have arisen between the parties. Count 7 of the trustee's counterclaim is dismissed.

### C. Fraudulently Concealed Evidence and Spoliation.

The trustee also asserts two related counterclaims, claiming that Great American fraudulently concealed evidence (Count 4) and/or negligently failed to preserve evidence (Count 5). The evidence alleged to have been concealed includes at least eleven (11) emails that the trustee presumes support a finding of coverage

under the insurance policies. The trustee contends that Great American destroyed the evidence months after the commencement of litigation between the parties, and months after discovery requests were made by the trustee.

As early as March 12, 2001, when Scheckton informed Great American's reinsurer of the prospect that the Tri–State policy would be rescinded, Great American was aware of the likelihood of litigation with Tri–State. The litigation commenced on June 4, 2001. The trustee served his document requests on Great American to produce all documents, including emails that related to the insurance policies and the trustee's claims, on July 19, 2001. On September 28, 2001, the trustee filed a motion to compel full and complete answers to his document request, prompting the entry of an order on December 12, 2001 directing Great American to comply with the trustee's document request. No emails were produced in response to the order.

In 2002, the trustee deposed Donald West, and learned that he had maintained a telephone log in connection with this case. On December 4 and 5, 2002, Great American produced Donald West's telephone log and his legal research file. The telephone log consisted of a steno pad with Donald West's handwritten list of the telephone and email contacts between himself and Great American representatives between March 1, 2001 and June 4, 2001. The telephone log listed eleven (11) email messages from Donald West to either Frank Scheckton, William Marston and/or Sean Missal, along with numerous faxes that were never provided in discovery or included in Great American's privilege log.[39] On December 11, 2002, Great Amer-

---

**39.** The steno pad indicated an email from West to Scheckton and Marston on March 4, 2001. On March 5, 2001, West received an email from Scheckton and sent one back to

ican was ordered to produce the emails. Two days later, Great American informed the court that it could not produce the emails because Donald West had discarded his computer six months ago,[40] and Great American had donated its computers to various charities and schools.[41] Great American also explained that it utilized America Online ("AOL") as its email provider and that AOL only saved emails for twenty-seven (27) days. Therefore, there were no backup records of the emails. On January 7, 2003, the trustee was granted leave to amend his counterclaim to include a count for spoliation of evidence.

Under New Jersey law, spoliation and fraudulent concealment of evidence are addressed in the same manner. "Spoliation, as its name implies, is an act that spoils, impairs or taints the value or usefulness of a thing." *Rosenblit v. Zimmerman*, 166 N.J. 391, 400, 766 A.2d 749, 754 (2001) (citing to BLACK'S LAW DICTIONARY 1409 (7th Ed.1999)). In legal parlance, "it is the term that is used to describe the hiding or destroying of litigation evidence, generally by an adverse party." *Id.* at 400–01, 766 A.2d at 754 (citing to Bart S. Wilhoit, *Comment, Spoliation of Evidence: The Viability of Four Emerging Torts*, 46 UCLA L.REV. 631, 633 (1998)). *See also Swick v. The New York Times Co.*, 357 N.J.Super. 371, 377, 815

A.2d 508, 511 (App.Div.), *certif. denied*, 176 N.J. 428, 824 A.2d 157 (2003). "Essentially, the tort action for spoliation affords damages to a plaintiff where the spoliator knows that litigation exists or is probable, the spoliator willfully or negligently destroys evidence with a design to disrupt plaintiff's case, or where such disruption is foreseeable, plaintiff's case is in fact disrupted, and plaintiff suffers damages proximately caused by the spoliator's acts." *Hewitt v. Allen Canning Co.*, 321 N.J.Super. 178, 183, 728 A.2d 319, 321 (App.Div.), *certif. denied*, 161 N.J. 335, 736 A.2d 528 (1999). *See also Grubbs v. Knoll*, 376 N.J.Super. 420, 435, 870 A.2d 713, 721–22 (App.Div.2005). The spoliator's level of intent is not determinative of liability, but affects the appropriate remedy that should be applied. *Aetna Life & Cas. Co. v. Imet Mason Contractors*, 309 N.J.Super. 358, 368, 707 A.2d 180, 185 (App.Div.1998). *See also Grubbs*, 376 N.J.Super. at 435, 870 A.2d at 722 ("Whether the spoliator acted negligently or intentionally does not affect the spoliator's liability, but merely is a factor to be considered when determining the appropriate remedy.").

For a cause of action under intentional spoliation, New Jersey courts apply the principles of the tort of fraudulent concealment.[42] To establish a cause of

---

him. West also received an email from Marston and spoke with him on the telephone. On March 6, 2001, West received an email from Scheckton, Marston and Missal. He responded with an email to Scheckton and Marston and thereafter received another email from Marston. On March 7, 2001, West received an email from Scheckton and one from Marston. On May 20, 2001, West received an email from Marston and then spoke to him on the telephone. He also received an email from Scheckton.

**40.** Donald West indicated that he purchased a new computer and printer in March 2002 when his old printer failed and he could not

get a new printer compatible with his old computer.

**41.** Scheckton's computer hard drive failed in the fall of 2001 and was replaced. In January 2002, Great American overhauled its computer systems, erasing the hard drives and donating the computers to schools or charities.

**42.** While several courts have imposed discovery related sanctions in response to spoliation, there is a trend toward creating tort actions for spoliation. New Jersey courts have, however, declined to recognize negligent spoliation of evidence as a separate tort. *Gilleski v. Community Medical Ctr.*, 336

action under this tort, the movant must show:

(1) That defendant in the fraudulent concealment action had a legal obligation to disclose evidence in connection with an existing or pending litigation;

(2) That the evidence was material to the litigation;

(3) That plaintiff could not reasonably have obtained access to the evidence from another source;

(4) That defendant intentionally withheld, altered or destroyed the evidence with purpose to disrupt the litigation;

(5) That plaintiff was damaged in the underlying action by having to rely on an evidential record that did not contain the evidence defendant concealed.

*Rosenblit v. Zimmerman,* 166 N.J. 391, 406–07, 766 A.2d 749, 758 (2001) (citing favorably to *Viviano v. CBS, Inc.,* 251 N.J.Super. 113, 126, 597 A.2d 543 (App. Div.1991), *certif. denied,* 127 N.J. 565, 606 A.2d 375 (1992)). The New Jersey Supreme Court has stated that "[s]uch conduct cannot go undeterred and unpunished and those aggrieved by it should be made whole with compensatory damages and, if the elements of the Punitive Damages Act, N.J.S.A. 2A:15–5.12, are met, punitive damages for intentional wrongdoing." *Id.* at 407, 766 A.2d 749.

Here, there are sufficient facts to conclude that the first three elements of the tort of fraudulent concealment have been established. Great American had a legal obligation to disclose evidence to the trustee in connection with the pending litigation, evidence dealing with the manner in which the claim was being adjudicated was material to the litigation, and the trustee had no other access to the information. As to the fourth element, one could readily surmise that Great American intentionally destroyed the emails, since the elimination of both Great American's and Donald West's electronic records, in a way that precluded retrieval of the records, appears to be more than coincidental. Buttressing the finding that Great American intentionally destroyed the emails is the fact that Marston, the only person at Great American charged with adjusting the Tri–State claim, maintained no file in connection with the claim, relying exclusively on the AMSEC written reports as his written record. Notwithstanding the fact that the Tri–State claim was the largest claim he ever adjusted at Great American, he maintained no internal notes, no hard copies of emails, and no copies of written communications, either sent or received. Ralph confirmed that it is highly unusual for a claims adjuster not to maintain a file on the conduct and progress of the claims process.

While the first four elements of fraudulent concealment may be established on this record, the last element, requiring a demonstration that the complaining party was damaged in the underlying action by the concealment, has not been established. In light of the determination that the policies in question have been rescinded, one can only speculate about how the trustee was damaged by having to rely on an evidential record that did not contain the evidence defendant concealed. As described above, the evidential record established that the 1999 and 2000 Tri–State renewal applications contained material

N.J.Super. 646, 652, 765 A.2d 1103, 1106 (App.Div.2001). *See also Kolanovic v. Gida,* 77 F.Supp.2d 595, 605–06 (D.N.J.1999). Instead, they have resorted to discovery sanctions, *Kolanovic,* 77 F.Supp.2d at 606 n. 22; *Hewitt v. Allen Canning Co.,* 321 N.J.Super.

178, 728 A.2d 319 (App.Div.1999), or to traditional tests for negligence causes of action. *Gilleski,* 336 N.J.Super. at 652, 765 A.2d at 1106; *Swick,* 357 N.J.Super. at 378, 815 A.2d at 512.

misrepresentations about past losses and occurrences which could lead to claims, on which Great American reasonably relied to issue renewal policies. I do not know, nor can I reasonably infer from this record, how information developed in March 2001 and beyond by Great American might have shed positive light on Tri–State's defenses to the rescission of the Great American policies.

 The same is true of the trustee's assertion regarding the negligent concealment of evidence by Great American. The trustee contends that Great American negligently failed to maintain adequate records by (1) erasing its computers' hard drives and donating them without saving backup copies of emails; (2) using AOL as its email provider even though the provider erases all emails after approximately a month; (3) failing to maintain any copies of the emails listed on Donald West's telephone log prior to disposing of his computer; (4) failing to instruct its employees to maintain copies of emails after Great American determined to deny coverage, and (5) failing to enact any type of company wide policy to preserve claims related documents. A cause of action based on negligence requires the demonstration of an injury to the plaintiff proximately caused by the defendant's breach. *Gilleski,* 765 A.2d at 1106. No articulated injury to the plaintiff has been shown.

For these reasons, Counts 4 and 5 of the trustee's Second Amended Counterclaim are dismissed.

## III. Conclusion

To recap, I conclude that Great American's quest to rescind the 1997 and 1998 policies is dismissed without prejudice because the trustee is not seeking to recover from the insurer pursuant to those policies. Great American is entitled to rescind the 1999 and 2000 policies based on equitable fraud principles.

As to the trustee's counterclaim:

(1) Count 1 seeking a declaratory judgment that coverage exists is denied because I have determined that Great American is entitled to rescission.

(2) Count 2 seeking damages for breach of contract is denied for the same reason.

(3) Count 3 asserting a cause of action under the New Jersey Consumer Fraud Act is denied because (a) it is not the type insurance policy intended to be protected by the Act and (b) the mere denial of benefits sought by the insured does not constitute an unconscionable commercial practice.

(4) Count 4, asserting that Great American fraudulently concealed evidence, is dismissed because the trustee has failed to show that it was damaged in the underlying action by the concealment.

(5) Count 5, asserting that Great American negligently failed to preserve evidence, is dismissed because the trustee has failed to show that it was damaged in the underlying action by the negligent concealment.

(6) Count 6, asserting that Great American breached a duty of good faith and fair dealing, is dismissed because I have concluded that Great American is entitled to rescission.

(7) Count 7, asserting a breach of fiduciary duty, is dismissed because (a) the trustee has failed to establish that a fiduciary relationship existed, (b) in the event that such a duty did exist, Great American's aggressive post claim investigation did not violate that duty, and (c) I have concluded that Great American is entitled to rescission, which would void any fiduciary duties that may have arisen.

Plaintiff's counsel is directed to submit a form of judgment consistent with this opinion